**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

SUSAN QASHU,
945 West Las Palmas Dr.
Tucson, AZ 85704

                Plaintiff,

      v.

ANTONY J. BLINKEN,
2201 C St. NW
Washington, DC 20520

                Defendant.

Case No. 22-1077
Judge McFadden

JURY DEMAND

**CORRECTED FIRST AMENDED COMPLAINT[1]**

1.      Susan Qashu is a scientist who began work at the U.S. Department of State (**Department or State Department**) in its Office of Ocean and Polar Affairs in 2016. She had previously earned her PhD from the University of Arizona, after working as a Peace Corps Volunteer and U.S. Park Ranger.

2.      For nearly her entire life, continuing throughout her time at the State Department, Dr. Qashu has suffered from a severe visual impairment that makes it impossible for her to perform tasks such as driving or reading text that is too small or far away.

---

[1]      This complaint was filed with the consent of Defendant Antony J. Blinken under Federal Rule of Civil Procedure 15(a)(2).

1

3.    Nevertheless, Dr. Qashu has succeeded academically and professionally through the use of computer technology and other accommodations that allow her to compensate for her legal blindness.

4.    At the State Department, however, Dr. Qashu was denied modest accommodations that she needed to perform her job effectively.

5.    Rather than granting necessary accommodations, Dr. Qashu's superiors ignored her requests, chastised her, and retaliated against her.

6.    Ultimately, the State Department forced Dr. Qashu out of her job by cancelling the renewal of her appointment at the Department, though renewals were uniformly granted to non-disabled colleagues.

7.    Dr. Qashu brings this case under the Rehabilitation Act of 1973 to seek redress for her unlawful treatment at the State Department.

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Ms. Qashu raises claims under the Rehabilitation Act of 1973 (**Rehabilitation Act**) that present federal questions over which this Court has jurisdiction.

9.    Venue is proper under 42 U.S.C. § 2000e-5(f)(3), made applicable to federal government by 42 U.S.C. § 2000e-16(d), because a substantial part of the unlawful employment practices herein alleged were committed within the District of Columbia and because the State Department has its principal office in the District of Columbia.

**PARTIES**

10.    Plaintiff Susan Qashu worked for the U.S. Department of State from February 2016 to February 2017. She now resides in Arizona, where she earned her PhD in 2010.

11.    Defendant Antony Blinken is the U.S. Secretary of State and is a named defendant, in his official capacity, as required by law. *See* 42 U.S.C. § 2000e-16(c).

**AGENCY EXHAUSTION AND TIMELINESS**

12.    Dr. Qashu pursued her claims through agency processes as required by statute and regulation.

13.    Dr. Qashu initiated her claims on or around August 1, 2016, when she met with the Department's Equal Employment Opportunity (**EEO**) counselor.

14.    The agency accepted for review Dr. Qashu's claims that she was denied reasonable accommodations for her disability, that she suffered discrimination because of her disability, that she was subjected to a hostile work environment, and that was she was a victim of retaliation for protected complaints.

15.    On January 18, 2022, the Office of Federal Operations of the Equal Employment Opportunity Commission issued a final decision in Dr. Qashu's case.

16.    This complaint was docketed in this Court on April 18, 2022, within the 90-day time period established by 42 U.S.C. § 2000e-16(c).

**FACTUAL ALLEGATIONS**

**Dr. Qashu's background and disability**

17.     Dr. Qashu is a 57-year old woman who has spent most of her career studying marine and natural resources sciences.

18.     Dr. Qashu received her bachelor's degree in mathematics from Smith College in 1989. After working as a Peace Corps Volunteer in Chile and a U.S. Park Ranger, she studied arid Land Resource Sciences at the University of Arizona, where she earned her PhD in 2010.

19.     After earning her PhD, Dr. Qashu worked in Malawi and Guinea on projects related to climate change, coastal and watershed management, smart agriculture, fisheries, and marine resource management, among other positions.

20.     In the 1980s, Dr. Qashu had been diagnosed with Leber Optic Neuropathy, a rare disease causing loss of vision.

21.     Multiple doctors have diagnosed Dr. Qashu with the condition and informed her that it is not correctable by glasses alone. Dr. Qashu is legally blind.

22.     In 2017, the D.C. Department of Disability Services certified that Dr. Qashu has a documented disability.

23.     State agencies in Arizona, Washington, and California have all also previously certified Dr. Qashu as having a documented disability.

24.     Dr. Qashu's poor vision makes it impossible for her to drive.

25.     The condition also makes it impossible for Dr. Qashu to read text in many circumstances, including when it is too small (typically, a bold-face font size 24 or smaller)

or too far away.  As a result, Dr. Qashu cannot read most commonly-formatted printed or electronic documents and cannot navigate a computer's graphical interface, including inputting log-in information and reading email.

26.     More generally, the condition also makes it impossible for Dr. Qashu to clearly see distances beyond about one foot in front of her, as her view is grainy and details are obscured.

27.     Dr. Qashu's condition is overall stable, but the visual impairment does worsen in certain circumstances, such as when aggravated by emotional stress or reading for too long with her prism lenses.

28.     Dr. Qashu's condition persisted throughout her time as an employee of the State Department.

29.     Because of her condition, when dealing with electronic documents such as emails, electronic calendars, and security logins, Dr. Qashu uses adaptive computer software and hardware that enlarges text and converts it into spoken words, thus allowing her to read and listen to the text.

30.     To use the software and hardware effectively, Dr. Qashu must be situated in a quiet space that allows her to hear the software completely.

31.     Dr. Qashu wears prism lenses, which allow her to read some printed documents between font sizes 18 and 12 (subject to font type, contrast, line spacing, and lighting) for short periods of time. However, because of the strain on her eyes, Dr. Qashu cannot read with the prism lenses for any significant period of time. Instead, she must scan a printed document and have it read to her via the same adaptive computer software and hardware.

**Dr. Qashu's Hiring at the State Department**

32.     In the spring of 2015, Dr. Qashu was selected for the American Association for the Advancement of Science and Technology Policy Fellowship sponsored by the American Association for the Advancement of Sciences (**AAAS**).

33.     The fellowship program assisted participants with placement in jobs within the executive branch of the federal government.

34.     In May 2015, Dr. Qashu was offered a position in the Office of Ocean and Polar Affairs (**OPA**) at the State Department.

35.     Dr. Qashu started in the position in February 2016.

36.     Executive Branch positions for AAAS fellows extend for an initial period of two years, with a renewal by consent of the employee, agency, and AAAS between the first and second year.

37.     The renewal is largely perfunctory. Agencies renew the appointment of nearly every fellow, unless the fellow chooses to depart.

38.     In addition, most fellows are offered the option to continue as federal government employees following the fellowship, although some choose to return to other jobs.

39.     During their two-year terms, AAAS fellows at the State Department are term federal government employees, whose salaries and benefits are paid by the federal government, and who work full-time for the federal government.

40.     At the Department, Dr. Qashu reported to Dave Sohier, OPA's Deputy Director. Her second-line supervisor was Evan Bloom, OPA's Director.

41.    Dr. Qashu had explained her disability to Bloom around the time that she received the job offer in May 2015, and again to both Bloom and Sohier during a meeting in September 2015.

**Department's Failure to Accommodate Dr. Qashu's Disability**

42.    During her time at the Department, Dr. Qashu was disadvantaged due to her disability and denied accommodations that she requested.

43.    Early in her time at the Department, Dr. Qashu was issued a variety of equipment to accommodate her disability, including a special keyboard, monitor, and handheld magnifier. When her eyes became too tired reading with the aforementioned tools, she switched to adaptive software on two machines that read aloud printed and electronic documents and emails to her.

44.    However, on several occasions continuing into the summer of 2016, Dr. Qashu informed Sohier that, due to the placement of her office within the building, there was too much noise to allow her to adequately hear or concentrate in order to use the equipment effectively.

45.    Dr. Qashu requested that Sohier accommodate her by moving her to another office.

46.    She pointed out to Sohier that there were four unoccupied offices in a quieter part of the building, away from the cable machine, fax, and printer which office mates regularly used and congregated by during work hours.

47.    However, Sohier did nothing to assist Dr. Qashu in moving to a different office. Nor did Sohier engage in any dialogue with Dr. Qashu about her request to relocate.

48.     As a result, Dr. Qashu remained in an office that precluded her from adequately using the hardware and software.

49.     Dr. Qashu was finally permitted to move to a different office in about October 2016.

50.     Prior to her move to a new office, Dr. Qashu was frequently unable to complete tasks during the workday due to the environment in her office. As a result, she had to wait until after the close of business, when the office was quieter. This led her to stay late at the office, get little sleep, and suffer from stress, frustration, and depression.

51.     Before her email access was fully functional, in February 2016, Dr. Qashu also missed numerous important staff meetings, including a new employee orientation, of which she was only notified by email. Because of problems with her adaptive computer equipment, she could not access her email during the first weeks of her employment. Despite her ongoing complaints to Sohier and others of missing meetings because she could not access email-based meeting invitations, no one attempted to inform her of the meetings in any other manner.  When Dr. Qashu asked Claudia Samson, OPA's Office Administrative Assistant for help with finding out meeting times and locations, Sampson screamed, "I only serve Mr. Bloom and Mr. Sohier!"

52.     When Dr. Qashu eventually attended a staff meeting in late February, she felt lost because she had missed the orientation and other prior meetings, and due to her lack of email access for several weeks. She therefore asked if the other staff could state their names and what they did. But Sohier said her request was inappropriate, both in front of others at the meeting and then later privately when he visited her in her office.

53. Over the same period and because of her disability, Dr. Qashu also had difficulty navigating the office buildings and hallways to find meeting and lecture locations. Dr. Qashu raised this issue with Sohier and others multiple times, explaining that she was missing the meetings she was aware of because she could not find the location in time.  In March 2016, Dr. Qashu asked Sohier if she could join when an upcoming new hire had her orientation and introductions around the building so that Dr. Qashu would have an opportunity to attend orientation and learn the building better. Sohier denied her request.

54. Sohier similarly rejected other requests Dr. Qashu made to take training that would have both aided in her work and helped remedy some of the lack of accommodation, including free trainings. This included a basic State Department training that covered building orientation, the protocol for clearing documents, accessing office calendars, cabling, sending faxes, emails and photocopying, reserving conference rooms, and arranging for visits by guests and inter-agency partners. Despite fellows and new civilian employees regularly completing such free or essential trainings, Sohier denied the requests, claiming, "you will never use it."

55. Even after her computer equipment was set up, it sometimes failed to work correctly. Dr. Qashu attempted to inform Sohier of these issues on several occasions, continuing into Summer 2016, but he repeatedly responded by turning his back to her and refusing to discuss the matter.  On other occasions, he responded with hostile and profane language.

56. Many of the problems with Dr. Qashu's computer equipment stemmed from the adaptive software needing memory and video cards that were not consistent with the older hardware provided by the Department's Information Technology (**IT**) department.

When Dr. Qashu contacted the IT department or the Department's Disability Reasonable Accommodations Division (**DRAD**) to resolve the issue, both would say that her supervisor needed to escalate a request to update the hardware. As stated, Sohier failed to engage on these accommodation issues. As result, Dr. Qashu's computer often froze multiple times a day for long periods.

57.     During the period of her employment and at least through June 2016, OPA also failed to accommodate Dr. Qashu with respect to printing, photocopying, sending cables, faxing, and other related functions she needed to do her job duties. All of these tasks relied on machinery that was difficult for Dr. Qashu to use reliably because of her disability. In particular, the copier and scanner had gray letters on a gray-green electronic screen, which resulted in poor contrast Dr. Qashu could not see.

58.     When Dr. Qashu attempted to discuss accommodations with Bloom, he refused and instructed her that she should only discuss policy issues with him, not administrative issues.

59.     Alicia Cahoon, an employee of DRAD, observed in a sworn affidavit that the management of Dr. Qashu's office "constantly" rejected her requests for accommodation.

60.     Cahoon also observed that management appeared to "resent" Dr. Qashu's need for accommodations and viewed the accommodations as an "imposition."

### Retaliation and Harassment Against Dr. Qashu

61.     Sohier made comments suggesting that he was hostile to Dr. Qashu's need for accommodations.

62.     For example, on approximately February 18, 2016, Sohier walked by Dr. Qashu speaking with Crystal Maitlin, a member of DRAD, and another employee regarding her computer equipment. Maitlin was helping Qashu login to her computer and setup printing access because she could not read the small print to do either. Sohier stated to Dr. Qashu, "Don't you know these people have things to do?!," or words to that effect.

63.     Through his statement, Sohier suggested that Dr. Qashu was wasting the time of Department employees by receiving help with her computer equipment. Dr. Qashu was distressed by Sohier's comment.

64.     Dr. Qashu and Maitlin each separately complained about Sohier's comments to DRAD.

65.     Soon after, Sohier confronted Dr. Qashu. Sohier explained that he had been called into a meeting with one of his superiors, who had heard about his statement, "Don't you know these people have things to do?!" in relation to Dr. Qashu receiving assistance with her computer equipment. Sohier appeared upset with Dr. Qashu.

66.     During this meeting and several subsequent meetings continuing under Summer 2016, Sohier aggressively thrusted his hips up and down in a manner that Dr. Qashu found offensive. Dr. Qashu never observed Sohier performing this action at any time other than when speaking with her. This conduct continued into Summer 2016 and afterwards.

67.     Sohier also directed profane language to Dr. Qashu on several occasions. On one instance on approximately June 30, 2016, he screamed at Dr. Qashu, "Why do you give a fuck?" Again, Dr. Qashu never observed Sohier speaking in this manner to anyone else.

68.     Over the same period, Sohier persisted in setting Dr. Qashu up for workplace failure through assignments and circumstances designed to frustrate her ability to work productively as a disabled employee.

69.     For instance, between May 2016 and August 2016, Sohier assigned Dr. Qashu to help another employee with a marine research vessel permitting system. Typically, interns had handled these permits or assisted employees with permitting. The task was not related to Dr. Qashu's work portfolio at the State Department, which consisted of arctic and aquatic invasive species, the United Nations' World Ocean Assessment phase II, and ocean acidification. Dr. Qashu tried to work with the permitting system, but her adaptive software crashed when using the system and could not handle the loading of documents that the system required. Dr. Qashu explained that to Sohier. Nevertheless, Sohier asked Dr. Qashu numerous times to work on this and each additional time she explained that the adaptive equipment continually crashed when trying to access the system. The crash would leave her adaptive software and hardware incapacitated for extended periods.

## Cancellation of Renewal of Dr. Qashu's Position

70.     In late March 2016, Dr. Qashu met with Bloom and Sohier and told them that she hoped to continue working with the office for the second year of the fellowship.

71.     She followed up the same day by email, confirming that she hoped to continue working in the office, and letting them know that "AAAS needs a decision concerning the second year from[] you all." An AAAS employee was copied on the email.

72.     The next day, Dr. Qashu again told Sohier by email that she hoped to "stay . . . with the GREAT hope of renewing with your office in 2017."

73.    In April 2016, a Department employee, who was also manager of the fellowship program, had told Dr. Qashu is that her renewal would be as a GS-13, Step 1, as was typical of an employee who had 7-years post-PhD experience.

74.    On June 3, 2016, Dr. Qashu received a letter from AAAS informing her that her fellowship would in fact be extended for a second year at OPA.

75.    Although the letter stated that the renewal was for the 2016-17 fellowship year, Department officials confirmed that to be an error, since Dr. Qashu was already in the midst of completing the 2016-17 fellowship year and would not need a "renewal" for that year. Rather, the letter appears to have been referring to renewal for the 2017-18 fellowship year. Dr. Qashu pointed out the typos and errors and initialed and corrected them.

76.    The State Department's AAAS managers stated they were working on correcting the renewal letter during the month of May. In June, Dr. Qashu received emails from one of them affirming that she was still working in it.

77.    Approximately six weeks after her renewal, however, the renewal was cancelled.

78.    On July 19, 2016, Sohier came to Dr. Qashu's office and asked whether she had seen "the letter" from AAAS. Dr. Qashu was not aware of what letter Sohier was referring to. Sohier mentioned that he had spoken to AAAS during the prior week about the subject of the letter.

79.    Dr. Qashu soon read the letter. It stated that AAAS had determined, "[i]n collaboration with the U.S. Department of State," that "a renewal fellowship year is no longer an option."

13

80.    The letter explained that renewals require approval of "the host agency and office, AAAS, and the fellow."

81.    The letter cited "[d]iscussions with you and the host office indicat[ing] that the match of your skills and interests to the focus and needs of the office is not aligned."

82.    In fact, Dr. Qashu's master's degree is in oceanography and marine resource management. Dr. Qashu's PhD fieldwork, research, and dissertation were in sustainable fisheries.  Thus, both her skills and interests matched the OPA's focus and needs.

83.    The letter acknowledged that "this is not the outcome you were hoping for."

84.    The letter stated that Dr. Qashu's employment would end on February 5, 2017.

85.    Despite her struggles with accommodations, retaliation, and harassment, Dr. Qashu had sought to continue her position at the Office and had communicated that desire to her superiors and AAAS. Thus, the letter's reference on "[d]iscussions with you and the host office" apparently referred to the office's desire to end her tenure, not to anything said by Dr. Qashu.

86.    The next day, July 20, 2016, Dr. Qashu discussed the letter with Sohier.

87.    During the meeting, Sohier made several criticisms of Dr. Qashu. He stated that Dr. Qashu had a trouble adjusting to working in an office; that she did not understand how to "clear" a document (referring to the Department's process for approval of memos and other documents); and that she made too many requests to travel, apparently referring to Dr. Qashu's desire to participate in travel needed for her work and portfolio.

14

88. Sohier suggested that these issues were the reason for the cancellation of her renewal. His comments confirmed that OPA, rather than Dr. Qashu or AAAS, had initiated the cancellation.

89. In fact, the claims about Dr. Qashu's performance were pretextual.

90. First, to the extent Dr. Qashu had any trouble working in an office, it was a direct result of the Department's failure to adequately accommodate her disability, as Sohier knew. Second, Dr. Qashu learned to clear documents in a normal manner for a new Department employee. Third, Dr. Qashu's requests regarding work-related travel were normal and appropriate.

91. Moreover, Sohier's past conduct had shown his hostility toward Dr. Qashu's disability and requests for accommodations, thus revealing the real reason for the non-renewal.

92. On July 22, 2016, Dr. Qashu met with AAAS and Department officials. They attributed the cancellation to conversations with Department employees. They identified Sohier as one of the people involved in such conversations.

93. To the best of Dr. Qashu's knowledge, all non-disabled fellows who served with her at the Department were offered renewal, and none had their renewals cancelled.

94. To the best of Dr. Qashu's knowledge, no non-disabled Advancement of Science and Technology Policy Fellow at the State Department has *ever* been denied a renewal or had such renewal cancelled.

95. Over the same period, other Department of State officials indicated to Dr. Qashu that she would not be permitted to re-interview for the purpose of conducting the second year of her fellowship at another bureau or office within the State Department or at

another executive branch agency. In contrast, several non-disabled fellows were given the opportunity by and assistance from State Department officials to switch to other offices or agencies for their second year. A Department employee, Chelsea Kaser, confirmed under oath that most fellows are renewed for a second year.

96.     Alicia Cahoon, a DRAD employee, attested in a sworn statement that management appeared to frequently treat other employees better than Dr. Qashu.

**Discrimination and Retaliation in Fall 2016**

97.     On or about August 1, 2016, Dr. Qashu initiated the instant case by contacting an Equal Employment Opportunity counselor in the Department's Civil Rights Office.

98.     Bloom knew about Dr. Qashu's complaint, as did Chever Voltmer, who took over from Sohier as Dr. Qashu's supervisor from September 2016 to February 2017, because she requested and received administrative leave to work on submitting information required for the complaint.

99.     Up until October 2016, Dr. Qashu was responsible for the ocean acidification portfolio in her office.

100.    Yet, following her complaint, in approximately October 2016, Voltmer announced in a meeting that Dr. Qashu's portfolio would be reassigned to another employee, a fellow who was a recent college graduate.

101.    The employee who took over the portfolio was significantly less qualified than Dr. Qashu, as she was not a scientist and had never previously worked with ocean acidification issues, oceanography, or marine research management.   Dr. Qashu's master's and PhD research covered precisely these areas.

102.    The employee who took over the portfolio was a GS-5, while Dr. Qashu was a GS-12, reflecting her significantly greater skills and relevant experience.

103.    Voltmer informed Dr. Qashu that, from that point forward, Dr. Qashu should assist the lower-graded employee and should not speak in inter-agency meetings without authorization from the lower-grade employee. Voltmer further instructed Dr. Qashu that in weekly staff meetings, she was no longer allowed to speak about her OPA portfolio duties unless given permission from the lower-grade employee. In doing so, Voltmer effectively demoted Dr. Qashu into a position subordinate to the lower-graded employee.

104.    Voltmer and Bloom then granted the lower-grade employee professional opportunities that had been withheld from Dr. Qashu, such as representing the Department by presenting to a large, international group of professionals at an ocean acidification conference.

105.    Soon after, in October 2016, the Department removed most of Dr. Qashu's remaining duties and most of her remaining portfolio and reassigned them to the same employee, still much less qualified than Dr. Qashu and employed at just the GS-5 level.

106.    Dr. Qashu continued to work under these circumstances until February 3, 2017.

**COUNT I**
**DISABILITY DISCRIMINATION IN VIOLATION OF THE**
**THE REHABILITATION ACT**

107.    Dr. Qashu realleges and incorporates the allegations contained in the preceding paragraphs as if fully stated herein.

108.    Section 501 of the Rehabilitation Act, 29 U.S.C. 791, as amended by 29 U.S.C. § 791(f) and 29 U.S.C. § 705(9)(B) and (20)(B) to incorporate provisions and definitions

17

contained in the Americans with Disabilities Act (**ADA**), prohibits federal executive branch agencies from discriminating against, failing to reasonably accommodate, and retaliating against qualified individuals with disabilities. It requires executive branch agencies to take affirmative action in the hiring, placing, and advancing of individuals with disabilities.

109.    Dr. Qashu is and was at all relevant times an individual with a "disability" as defined by the ADA, 42 U.S.C. § 12102(1), as incorporated by 29 U.S.C. 791(f), because she (a) had a physical vision impairment that substantially limited one or more major life activities, including driving, (b) had a record of such physical impairment, and (c) was regarded by Defendant as a person with such impairment.

110.    Dr. Qashu is and was at all relevant times a "qualified individual" as that term is defined by the ADA, 42 U.S.C. § 12111(8), as incorporated by 29 U.S.C. 791(f), because she was able to perform the essential functions of her job with reasonable accommodations.

111.    Defendant intentionally discriminated against Plaintiff because of her disability by subjecting Dr. Qashu to adverse employment actions including, but not limited to, denying her reasonable accommodations, retracting the renewal of her fellowship position so as to result in her termination, demoting her, terminating her employment, and refusing to hire her for a second fellowship year.

112.    Defendant violated Dr. Qashu's rights under the Rehabilitation Act, by discriminating against her because of her disability.

113.    Defendant's actions have caused and will continue to cause Dr. Qashu to suffer lost compensation and other benefits of employment and damages for emotional

distress, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, all in an amount to be established at trial.

114.    Dr. Qashu is entitled to damages including back pay and lost benefits of employment and reinstatement to her original position by Defendant.

## COUNT II
## DENIAL OF REASONABLE ACCOMMODATIONS IN VIOLATION OF THE REHABILITATION ACT

115.    Dr. Qashu realleges and incorporates the allegations contained in the preceding paragraphs as if fully stated herein.

116.    Defendant denied Dr. Qashu the reasonable accommodations she requested and refused to engage in the interactive process, including but not limited to, denial of available, quieter office space she needed to use her adaptive software and hardware, denial of alternative means to be notified of meetings when her adaptive software and hardware were not working properly, denial of upgraded computer hardware and video card that would work effectively with the adaptive software, denial of accommodation to allow her to use the printers, copiers, and fax machines, and denial of opportunities that would improve her knowledge of and mobility around the office buildings.

117.    By denying Dr. Qashu reasonable accommodations and instead retracting the renewal of her fellowship, demoting her, terminating her employment, and refusing to hire her for a second fellowship year, Defendant discriminated against Dr. Qashu because of her disability and violated her rights under the Rehabilitation Act.

118.    Defendant's actions have caused and will continue to cause Dr. Qashu to suffer lost compensation and other benefits of employment and damages for emotional

distress, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, all in an amount to be established at trial.

119.    Dr. Qashu is entitled to damages including back pay and lost benefits of employment and reinstatement to her original position by Defendant.

## COUNT III
### RETALIATION IN VIOLATION OF THE REHABILITATION ACT

120.    Dr. Qashu realleges and incorporates the allegations contained in the preceding paragraphs as if fully stated herein.

121.    Dr. Qashu engaged in statutorily protected activity by, among other things, exercising or attempting to exercise or enjoy her rights under the Rehabilitation Act, including but not limited to complaining about discrimination, requesting reasonable accommodations for her disability, and engaging in the EEO process and filing a formal EEO complaint for discrimination and retaliation.

122.    After she began to complain about discrimination and/or ask for reasonable accommodations for her disability, Defendant intentionally retaliated against Dr. Qashu in violation of the Rehabilitation Act by retracting the renewal of Dr. Qashu's fellowship position so as to result in her termination and by subjecting Dr. Qashu to marginalization, ostracization, and false criticism in the workplace, including but not limited to demeaning behavior intended to lower coworkers' regard for her in the workplace, requiring her to engage in job duties that were non-essential and inconsistent with her reasonable accommodation to induce her to publicly fail, and denying her reasonable accommodations to attend and locate meetings.

123.   After she commenced the EEO process on or about August 1, 2016, Defendant intentionally retaliated against Dr. Qashu in violation of the Rehabilitation Act by demoting her and ultimately terminating her employment.

124.   Defendant's actions have caused and will continue to cause Dr. Qashu to suffer lost compensation and other benefits of employment and damages for emotional distress, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, all in an amount to be established at trial.

125.   Dr. Qashu is entitled to damages including back pay and lost benefits of employment and reinstatement to her original position by Defendant.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays that this Court:

1. Declare that Defendant has violated the Rehabilitation Act;

2. Order that the renewal of Dr. Qashu's former fellowship position at a grade GS-13, be reinstated retroactive to February 3, 2017;

3. Award Dr. Qashu full back pay and all related benefits based on reinstatement to the above referenced position retroactive to February 3, 2017, including but not limited to associated increases in merit pay and annuity calculations and prejudgment interest;

4. Issue an order requiring Defendant to retract or remove from Dr. Qashu's employment file any allegations relating to or references to the retraction or non-renewal of her fellowship, her termination, and all discipline or

21

complaints incurred because of discrimination, denial of reasonable accommodation, and retaliation;

5. Award compensatory damages in an amount to be proven at trial;

6. Award punitive damages as allowed by law;

7. Award medical costs and expenses incurred as a result of Defendant's unlawful conduct;

8. Award reasonable attorney fees, costs, and expenses incurred for this action and the administrative actions that necessarily preceded it; and

9. Award other relief that the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands trial by jury on all issues.

Respectfully submitted,

*/s/ Daniel M. Rosenthal*
Daniel M. Rosenthal
Olga Metelitsa Thall
James & Hoffman, P.C.
1629 K Street NW, Suite 1050
Washington, DC 20006
Tel: (202) 496-0500
Fax: (202) 496-0555
dmrosenthal@jamhoff.com
omthall@jamhoff.com

*Attorneys for Plaintiff*

Dated: October 12, 2022

## CERTIFICATE OF SERVICE

I hereby certify that on October 12, 2022, a copy of the foregoing "CORRECTED

FIRST AMENDED COMPLAINT" was filed electronically. I understand that notice of this

filing will be sent to all parties by operation of the Court's electronic filing system. Parties

may access this filing through the court's system.


*/s/ Daniel M. Rosenthal*