UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SUSAN QASHU,<br><br>Plaintiff,<br><br>v.<br><br>ANTONY J. BLINKEN,<br>Secretary of State,<br><br>Defendant. | Civil Action No. 22-1077 (TNM) |

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Antony Blinken, in his official capacity as Secretary of the Department of State ("Defendant" or "State"), respectfully moves through undersigned counsel for summary judgment under Federal Rule of Civil Procedure 56(a). Plaintiff Susan Qashu, who is visually impaired, contends that while she was employed as a fellow at the Department of State, she was intentionally discriminated against because of her disability, denied reasonable accommodation, and retaliated against after engaging in protected activity, all in violation of the Rehabilitation Act of 1973. This motion is based on the attached memorandum of points and authorities, and statement of undisputed material facts. A proposed order is also attached.

* * *

Dated: September 15, 2023

Respectfully submitted,

MATTHEW M. GRAVES, D.C. Bar #481052
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division

By: */s/ L'Shauntee J. Robertson*
L'SHAUNTEE J. ROBERTSON, D.C. Bar #980248
Assistant United States Attorney
555 Fourth Street, NW
Washington, DC 20530
(202) 252-1729

*Attorneys for the United States of America*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SUSAN QASHU,

Plaintiff,

v.

ANTONY J. BLINKEN,
Secretary of State,

Defendant.

Civil Action No. 22-1077 (TNM)

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ........................................................ 1
*Baloch v. Kempthorne*, 550 F.3d 1191 (D.C. Cir. 2008) .......................................................... 11
*Bowden v. United States*,
106 F.3d 433 (1997)........................................................................................................ 16
*Brady v. Off. of Sergeant at Arms*, 520 F.3d 490 (D.C. Cir. 2008) ............................................ 11
*Brett v. Brennan*, 299 F. Supp. 3d 63 (D.D.C. 2018) ............................................................. 16
*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................................................ 1
*Chinchillo v. Powell*, 236 F. Supp. 2d 18 (D.D.C. 2003) .......................................................... 4
*Cogdell v. Murphy*, Civ. A. No. 19-2462 (RC), 2020 WL 6822683 (D.D.C. Nov. 20, 2020) ..... 10
*Congress v. Gruenberg*, Civ. A. No. 19-1453 (CKK), 2022 U.S. Dist. LEXIS 216276 (D.D.C. Dec. 1, 2022)................................................................................................................... 4
*Edwards v. EPA*, 456 F. Supp. 2d 72 (D.D.C. 2006)................................................................. 4
*Fischbach v. District of Columbia Dep't of Corrections*,
86 F.3d 1180 (D.C. Cir. 1996) ........................................................................................ 17
*Flemmings v. Howard Univ.*, 198 F.3d 857 (D.C. Cir. 1999)....................................................... 4
*Floyd v. Lee*, 968 F. Supp. 2d 308 (D.D.C. 2013) ................................................................... 10
*Graffius v. Shinseki*, 672 F. Supp. 2d 119 (D.D.C. 2009)..................................................... 4, 17
*Gross v. Akin*, 599 F. Supp. 2d 23 (D.D.C. 2009) ............................................................. 17, 18
*Holcomb v. Powell*, 433 F.3d 889 (D.C. Cir. 2006) ................................................................. 11
*Laningham v. U.S. Navy*, 813 F.2d 1236 (D.C. Cir. 1987)......................................................... 2
*Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994) ........................................................... 2
*Marks v. Wash. Wholesale Liquor Co. LLC*, 253 F. Supp. 3d 312 (D.D.C. 2017)........................ 8
*Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574 (1986).............................................. 1
*McDonnell Douglas v. Green*, 411 U.S. 792 (1973) ................................................................. 10
*Menoken v. Burrows*, Civ. A. No. 16-2480 (DLF), 2023 U.S. Dist. LEXIS 17239 (D.D.C. Feb. 2, 2023) ........................................................................................................................... 3
*Milton v. Weinberger*, 696 F.2d 94 (D.C. Cir. 1982)................................................................ 17
*Perry v. Donovan*, 733 F. Supp. 2d 114 (D.D.C. 2010) ........................................................... 11

*Richardson v. Mayorkas,* No. 17-1588 (EGS/ZMF), 2023 U.S. Dist. LEXIS 45785 (D.D.C. Mar. 17, 2023) ........ 3

*Rupard v. Mayorkas*, Civ. A. No. 22-1806 (CRC), 2023 U.S. Dist. LEXIS 154603 (D.D.C. Aug. 31, 2023) ........ 15

*Sandler v. Blinken*, Civ. A. No. 21-2226 (DLF), 2022 WL 4547557 (D.D.C. Sept. 29, 2022).... 10

*Stewart v. St. Elizabeths Hosp.*, 589 F.3d 1305 (D.C. Cir. 2010) ........ 4

*Tao v. Freeh*, 27 F.3d 635 (D.C. Cir. 1994) ........ 1

*Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248 (1981) ........ 11

*Thompson v. Rice*, 422 F. Supp. 2d 158 (D.D.C. 2006) ........ 9

*Tobey v. GSA*, 480 F. Supp. 3d 155 (D.D.C. 2020) ........ 8

*U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711 (1983) ........ 11

*Ward v. McDonald*, 762 F.3d 24 (D.C. Cir. 2014) ........ 3

*Weatherspoon v. Azar*, 380 F. Supp. 3d 65 (D.D.C. 2019) ........ 8

*Woodruff v. LaHood*, 777 F. Supp. 2d 33 (D.D.C. 2011) ........ 4

**Statutes**

42 U.S.C. § 12112(b)(5)(A) ........ 3

**Rules**

Fed. R. Civ. P. 56(e) ........ 2

**Regulations**

29 C.F.R. § 1630.2(o)(1)(ii) ........ 4

# TABLE OF CONTENTS

**FACTUAL BACKGROUND** ........................................ 1

**LEGAL STANDARDS** ........................................ 1

**ARGUMENT** ........................................ 2

**I. Plaintiff's Reasonable Accommodation Claim Is Belied By The Factual Record.** ..... 3

**II. Plaintiff's Disability Discrimination Allegations Fail Under the *McDonnell Douglass* Framework.** ........................................ 10

**A. Plaintiff's Non-Renewal** ........................................ 12

**B. Plaintiff's "Demotion"** ........................................ 14

**CONCLUSION** ........................................ 18

**TABLE OF EXHIBITS**

| Defendant's Exhibit No. | Description |
|---|---|
| 1A | AAAS Fellowship Notification Letter May 22 2015 |
| 1B | AAAS Fellowship 2015-2016 Terms of Agreement |
| 2 | Dep of State Fellowship Confirmation Letter Dec. 31 2015 |
| 3 | EEOC Deposition Transcript of Susan Qashu, Jan. 13, 2020 |
| 4 | Deposition Transcript of Evan Bloom, June 14, 2023 |
| 5 | Deposition Transcript of Richard McCarthy, May 18, 2023 |
| 6A | Email, "FW: from Susan Qashu: Assistive Technology Needs" |
| 6B | Email, "Re: Questions on assistive technologies at State Department" |
| 6C | Email, "Re: Checking In" |
| 6D | Email, "RE DC AAAS training and desk space question" |
| 6E | DRAD Equipment Inventory Sheet |
| 6F | IRM Service Tickets for Qashu |
| 7 | Set of Emails from Susan Qashu Praising DRAD |
| 8A | Email, "Lionfish on held (sic)" |
| 8B | Email, "Initial Portfolio" |

| | |
|---|---|
| 8C | Excerpt from EEOC Affidavit of Chever Voltmer |
| 8D | Email, “Hiring a Boren Fellow?” |
| 8E | Email, “RE: Quick question about OA workshop content” |
| 9 | Deposition Transcript of Allison Schwier, June 9, 2023. |
| 10A | Email, “FW: Please meet up with me today … DECISION TO GO BACK INTO THE POO[L]” |
| 10B | Email, FW: AAAS Renewal |
| 10C | Form Host Office Intent to Renew |
| 10D | June 3, 2016 AAAS Fellowship Renewal Letter |
| 10E | Email, Meeting with Susie Qashu: Clarification needed |
| 10F | Email, FW: Chat about AAAS Fellowship renewal |
| 10G | July 19, 2016 Fellowship Renewal Retraction Letter |
| 11 | Deposition Transcript of William Davies Sohier, June 23, 2023 |

Susan Qashu ("Plaintiff"), a former one-year science fellow at the Department of State ("Defendant" or "State"), is dissatisfied that she was not able to renew her fellowship for a second year. But by agreement, a second year was never promised to Plaintiff. And when her renewal offer was rescinded because she could not obtain a renewal of her fellowship for a second year on her own terms, Plaintiff was unsurprisingly disappointed. Plaintiff now brings this action, claiming that she was discriminated and retaliated against because of her visual impairment. And despite overwhelming evidence that she was, in her own words, stupendously accommodated, she now claims that Defendant failed to reasonably do so. Plaintiff's claims that Defendant failed to reasonably accommodate her (Count II) are belied by the factual record, and she fails to plausibly allege any facts beyond bare assertions to establish a nexus between her visual impairment and alleged discrimination (Count I) or retaliation (Count III). In any event, Defendant has proffered legitimate, non-discriminatory and non-retaliatory explanations for any adverse actions Plaintiff experienced. For these reasons, and as argued further below, Defendant is entitled to summary judgment on all of Plaintiff's claims.

## FACTUAL BACKGROUND

Defendant's Statement of Undisputed Material Facts is incorporated herein by reference.

## LEGAL STANDARDS

Summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56(c) is appropriate where, as here, the record shows that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994). In determining whether a genuine issue of material fact exists, the trier of fact must view all facts, and reasonable inferences drawn there from, in the light most favorable to the non-

moving party. *Matsushita*, 475 U.S. at 587. The mere existence of a factual dispute, however, will not defeat summary judgment. The non-moving party must show that the dispute is genuine and material to the case. That is, the factual dispute must be capable of affecting the substantive outcome of the case and supported by sufficiently admissible evidence that a reasonable trier of fact could find for the non-moving party. *Anderson*, 477 U.S. at 247-48; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987). If the evidence favoring the non-moving party is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249-50 (citations omitted). "[A] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial[,] [and] [t]he moving party is entitled to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323 (citations omitted).

Moreover, Rule 56 does not require the moving party to negate the non-movant's claim or to show the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Rather, when the movant files a properly supported summary judgment motion, the burden shifts to the nonmoving party to show "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Further, the non-movant cannot manufacture genuine issues of material fact with "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, or with "conclusory allegations," "unsubstantiated assertions," "or by only a scintilla" of evidence." *Little v. Liquid Air Corp*., 37 F.3d 1069, 1075 (5th Cir. 1994). *See also Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

**ARGUMENT**

Plaintiff's assertions that State failed to reasonably accommodate her (Count II) are belied by the factual record. The record shows, and Plaintiff has admitted that State went above and beyond to accommodate her disability, granting virtually every request Plaintiff made for an

accommodation. And because she can point to no nexus between her visual impairment and alleged discrimination (Count I) or retaliation (Count III), those claims must also fail. More importantly, however, State has proffered legitimate, non-discriminatory and non-retaliatory explanations for any adverse actions Plaintiff experienced. For these reasons, and as argued further below, Defendant is entitled to summary judgment.

## I. Plaintiff's Reasonable Accommodation Claim Is Belied By The Factual Record.

The Rehabilitation Act requires federal employers to provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the [employer's] business[.]" 42 U.S.C. § 12112(b)(5)(A). "Few disabilities are amenable to one-size-fits-all accommodations," and the interactive process contemplated for determining what accommodations are reasonable "is 'a flexible give-and-take' between employer and employee so that together they can determine what accommodation would enable the employee to continue working.'" *Richardson v. Mayorkas,* No. 17-1588 (EGS/ZMF), 2023 U.S. Dist. LEXIS 45785, at *32 (D.D.C. Mar. 17, 2023) (quoting *Ward v. McDonald*, 762 F.3d 24, 31 (D.C. Cir. 2014)).

To prove a reasonable accommodation violation, a plaintiff must show, among other things, that her employer denied her request for a reasonable accommodation of her disability. *Menoken v. Burrows*, Civ. A. No. 16-2480 (DLF), 2023 U.S. Dist. LEXIS 17239, at *6 (D.D.C. Feb. 2, 2023) (citations omitted). To prove the denial of a reasonable accommodation request, a plaintiff must show either that the agency ended the interactive process or that it participated in the process in bad faith. *Richardson*, 2023 U.S. Dist. LEXIS 45785, at *32 (citation omitted). This analysis considers whether a party "obstructs or delays the interactive process" or "fails to communicate,

by way of initiation or response," and should "isolate the cause of the breakdown and then assign responsibility." *Id.* at *32-33. Employers can show good faith by meeting with the employee, requesting information about her condition and limitations, asking the employee what she specifically wants, showing signs of having considered the employee's request, and discussing alternatives when the request is burdensome. *Woodruff v. LaHood*, 777 F. Supp. 2d 33, 41-42 (D.D.C. 2011) (citation omitted).

The plaintiff-employee is not free of responsibility in this interactive process. "An underlying assumption of any reasonable accommodation claim is that the plaintiff-employee has requested an accommodation which the defendant-employer has denied. *Congress v. Gruenberg*, Civ. A. No. 19-1453 (CKK), 2022 U.S. Dist. LEXIS 216276, at *29-30 (D.D.C. Dec. 1, 2022) (citing *Flemmings v. Howard Univ.*, 198 F.3d 857, 861 (D.C. Cir. 1999)). Hence, "[t]o create an issue for the jury," a plaintiff must point to "sufficient evidence" in the record showing that she requested an accommodation and "that, after the request, [defendant] refused to make an accommodation." *Id.* at *30 (citing *Stewart v. St. Elizabeths Hosp.*, 589 F.3d 1305, 1308 (D.C. Cir. 2010)); *see also Edwards v. EPA*, 456 F. Supp. 2d 72, 102 (D.D.C. 2006) ("The dispositive issue is whether [plaintiff] requested and was denied an accommodation."). As for the accommodation itself, "the employee has the burden of identifying reasonable accommodations." *Graffius v. Shinseki*, 672 F. Supp. 2d 119, 126 (D.D.C. 2009) (citing *Chinchillo v. Powell*, 236 F. Supp. 2d 18, 23-24 (D.D.C. 2003)). A reasonable accommodation, which a plaintiff has the burden to identify, is defined as "modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position." *Congress*, 2022 U.S. Dist. LEXIS 216276, at *30 (quoting 29 C.F.R. § 1630.2(o)(1)(ii)). To determine an

appropriate reasonable accommodation, the employer should "initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation," which "should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Id.* An employer is not required to provide an employee the accommodation she requests or prefers; rather, the employer need only provide some reasonable accommodation." *Id.* (citation omitted).

Here, Plaintiff alleges in Count II that State denied her reasonable accommodations and refused to engage in the interactive process. Am. Compl., ¶ 116. Specifically, Plaintiff alleges that State denied her relocation to an available, quieter office space so that she could use her adaptive software and hardware; alternative means to be notified of meetings when her adaptive software and hardware were not working properly; upgraded computer hardware and video card that would work effectively with the adaptive software; accommodation to allow her to use the printers, copiers, and fax machines; and "opportunities that would improve her knowledge of and mobility around the office buildings." *Id.* These allegations are without merit.

First, Plaintiff cannot demonstrate that State either ended the interactive process or engaged in the process in bad faith, or that it denied any of her reasonable accommodation requests. Quite the opposite is clear from the record. There was nothing that Plaintiff requested in the way of reasonable accommodation that State denied. *See, e.g.*, Def. Ex. 7. In fact, State went above and beyond to grant Plaintiff's requests for accommodation, to ensure that her assistive devices and technology worked properly, and to promptly troubleshoot any issues Plaintiff may have experienced. *See, e.g.*, Def. Ex. 5, Deposition of Richard McCarthy ("McCarthy Dep.") 34:18-35:9, 42:10-44:19, 47:3-18, 245:7-253:1. Well before her first day of work, State's Disability and Reasonable Accommodation Division ("Accommodation Division") began engaging Plaintiff in

on-going conversations about her visual impairment and the needed accommodations. *See, e.g.*, Def. Ex. 6A, Email, "FW: from Susan Qashu: Assistive Technology Needs." Richard McCarthy, one of State's Accommodation Division analysts, worked closely with Plaintiff to accommodate her specific written requests for certain assistive technology that would reasonably accommodate Plaintiff's visual disability. *See, e.g.*, Def. Ex. 6A, Email, "FW: from Susan Qashu: Assistive Technology Needs". Through numerous emails and telephone calls with Plaintiff, Mr. McCarthy discussed and clarified her requests. *See*, *e.g.*, Def. Ex. 6B, Email, "Re: Questions on assistive technologies at State Department". Plaintiff and Mr. McCarthy spoke at length on July 31, 2015, about her requested accommodations, and, as a result, Mr. McCarthy provided Plaintiff with detailed descriptions for some of the suggested technology which State either had on hand or would purchase, and for which Plaintiff provided approvals and feedback. *Id.* Plaintiff and Mr. McCarthy remained in contact throughout the fall and winter of 2015 to discuss various proposed assistive technology products, and to keep Plaintiff informed about and involved with the status of ordering specific products for her use in the fellowship. *Id.*, *see also* Def. Ex. 6C, Email, "Re: Checking In". State even arranged for Plaintiff to visit her future office space, at her request, to ensure her satisfaction with "the desk space in the office and the lighting." *See* Def. Ex. 6D, Email, "RE: DC AAAS training and desk space question".

As a result of the interactive process, State provided Plaintiff with at least three separate closed-circuit television (CCTV) systems to help her see things at a distance, including arranging for one to be tested by Plaintiff in her home state of Arizona before she formally began her fellowship with State. *See* McCarthy Dep., at 85:11-87:1, 89:1-97:15. State also provided Plaintiff a number of other items to accommodate her visual impairment, including: (1) a large print slim line keyboard; (2) a portable, handheld video magnifier; (3) a 27" monitor; (4) a monitor arm; (5)

an external keyboard for her iPhone; and (6) a pair of Bose noise cancelling headphones. *See* Def. Ex. 6E, Accommodation Division Equipment Inventory Sheet. Additionally, State installed ZoomText, a software system with a speech reading function that operates as a "built-in magnifier" on Plaintiff's Department-provided computer systems. *See* McCarthy Dep. 150:17-152:4. ZoomText was designed to work with all of State's computer applications. *Id.* at 153:3-17. Additionally, the Accommodation Division worked to customize Plaintiff's settings on ZoomText to ensure that it would meet Plaintiff's needs. *Id.* at 154:2-11. Plaintiff's computer was also set up with JAWS, "a screen reading and screen navigation tool" that reads accessible text back to a computer user. *Id.* at 158:18-160:11. The Ruby handheld magnifier device that State provided Plaintiff had the ability to perform color filtration on its visualization screen. *Id.* at 186:9-187:8.

Beginning before her first day of work and continuing throughout her time at State, Accommodation Division analysts were committed to working with Plaintiff to deliver, install, and troubleshoot her assistive software and hardware. *See, e.g.*, Def. Ex. 6B. Accommodation Division staff often met with Plaintiff personally to discuss her accommodation and assistive technology needs. These included providing her with a CCTV to help see projected images at the front of the room during training courses at the Foreign Service Institute. *See* McCarthy Dep. 86:7-88:6. Plaintiff also requested and was provided with the support of a reader, or an individual assigned to read items aloud to Plaintiff and help her complete tasks, on numerous occasions. *See, e.g.*, McCarthy Dep. 198:6-13.

To be sure, Plaintiff routinely and profusely praised the Accommodation Division for its accommodations. Plaintiff told the Accommodation Division staff that the office had been "stupendous, even before [she] arrived," and that, she had "never experience[d] such a great accommodations office." *See*, e.g, Def. Ex. 7. Right up to the very end of her fellowship, Plaintiff

believed that it had been "a wonderful experience" working with the Accommodation Division. *Id*.

With respect to her request to move to a quieter office space, Plaintiff concedes that her request was in fact granted. Even crediting her vague allegations that she requested the space "on several occasions continuing into the summer of 2016," she admits that she was "finally permitted to move to a different office in about October 2016." Am. Compl., at ¶ 49. Plaintiff would be hard pressed to demonstrate that State failed to accommodate her on this admission. At best, she can argue that provision of the new office space was delayed. But she would not prevail even on that point, as courts in this Circuit have held that a "[a] relatively short delay of a few weeks (or even a few months) in approving a request typically does not support such a claim." *Marks v. Wash. Wholesale Liquor Co. LLC*, 253 F. Supp. 3d 312, 324 (D.D.C. 2017) (collecting cases). Even "a four-or six-month wait is not inordinate time" and therefore not unreasonable. *Weatherspoon v. Azar*, 380 F. Supp. 3d 65, 72 (D.D.C. 2019); *see also Tobey v. GSA*, 480 F. Supp. 3d 155, 170 (D.D.C. 2020) (six-week delay not unreasonable). Additionally, the dispositive issue is whether plaintiff requested and was denied an accommodation. *See Edwards*, 456 F. Supp. 2d at 102. This, Plaintiff simply cannot show. Virtually every request Plaintiff made, she was granted.

With respect to alternative means to be notified of meetings, accommodation to allow her to use the printers, copiers, and fax machines, or the elusive "opportunities that would improve her knowledge of and mobility around the office buildings," Am. Comp. at ¶ 116, Plaintiff never specifically requested those accommodations to the Accommodation Division. The plaintiff-employee has the responsibility to engage in the interactive process to identify the precise limitations resulting from her specific disability, and the potential reasonable accommodations that could overcome those specific limitations. *See Congress*, 2022 U.S. Dist. LEXIS 216276, at *30.

Here, Plaintiff was demonstrably aware that requests for accommodation needed to be made to the Accommodation Division. She cannot be given accommodations she did not request. *See, e.g.*, *Thompson v. Rice*, 422 F. Supp. 2d 158, 178 (D.D.C. 2006) (granting summary judgment against employee who presented no evidence indicating that she specifically requested a particular accommodation connected to her disability).

At best, Plaintiff may be able to demonstrate that the accommodations she received, such as assistive technology, were imperfect in the sense they that required troubleshooting from time to time. See Am. Compl., at ¶ 55 ("Even after her computer equipment was set up, it sometimes failed to work correctly."). But the law does not require perfect, stellar, or the best possible accommodations one can conceive. Only some reasonable accommodation is required, and that is what State provided Plaintiff here. And in every turn when Plaintiff experienced an issue with her accommodations, State promptly addressed them. *See* McCarthy Dep. 43:15-44:7. At least sixty-six separate service requests were made by Plaintiff or on her behalf between February 11, 2016 and March 2, 2017, each of them marked "Resolved". *See* Def. Ex. 6F.

The record is clear that State engaged in good faith in the interactive process with Plaintiff to reasonably accommodate her visual impairment, beginning prior to her arrival and continuing to the end of her fellowship. State provided Plaintiff with readers when requested, moved her to a quieter office space, and modified and adjusted Plaintiff's work equipment, promptly troubleshooting any issues that arose. Plaintiff, having herself praised State for its accommodations, cannot now demonstrate the opposite. The Court should therefore grant summary judgment on Count II in favor of State.

## II. Plaintiff's Disability Discrimination Allegations Fail Under the *McDonnell Douglass* Framework.

In Count I, Plaintiff alleges that State intentionally discriminated against her because of her disability, by (1) denying her reasonable accommodations, (2) retracting the renewal of her fellowship position and refusing to hire her for a second fellowship year, and (3) "demoting" her. Am. Compl., at ¶ 111. These claims all fail as a matter of fact and law.

As an initial matter, Plaintiff cannot bring a separate intentional discrimination claim under the Rehabilitation Act for any alleged failure to accommodate. *See Cogdell v. Murphy*, Civ. A. No. 19-2462 (RC), 2020 WL 6822683, at *9 n.5 (D.D.C. Nov. 20, 2020) (declining to consider alleged denial of reasonable accommodation as a separate claim for purposes of intentional disability discrimination); *Floyd v. Lee*, 968 F. Supp. 2d 308, 334 (D.D.C. 2013) ("[I]f the denial of a request for accommodation could itself support a claim of retaliation based on the request, then every failure-to-accommodate claim would be doubled."); *Sandler v. Blinken*, Civ. A. No. 21-2226 (DLF), 2022 WL 4547557, at *7 (D.D.C. Sept. 29, 2022) (dismissing any intentional discrimination or retaliation claims under Rehabilitation Act as duplicative of failure-to-accommodate claim). The Court should therefore dismiss any discrete Rehabilitation Act intentional discrimination or retaliation claims premised on the Department's alleged failure to accommodate his alleged disability. As for her remaining discrimination allegations based upon non-renewal of her fellowship and her alleged demotion, Plaintiff cannot show that any of these adverse actions were taken because of her disability. And in any event, State has articulated legitimate, non-discriminatory, and non-pretextual reasons for its actions.

Claims of discrimination based on disability under the Rehabilitation Act, are subject to the burden-shifting framework established in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). *Congress*, 2022 U.S. Dist. LEXIS 216276, at *51-53. Pursuant to that framework, the plaintiff has

the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination. *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 252-53 (1981). "[T]he two essential elements of a discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's . . . disability." *Baloch v. Kempthorne*, 550 F.3d 1191 (D.C. Cir. 2008).

Where a defendant has proffered a non-discriminatory rationale for their employment action, along with supporting evidence, it becomes "no longer relevant" if the plaintiff has established a prima facie case. *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983). In fact, the Court of Appeals has dictated that this Court "need not—and should not—decide" whether the plaintiff has made out a prima facie case at this stage. *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (emphasis in original). Instead, the Court need only determine whether plaintiff has "produced sufficient evidence for a reasonable jury to find that the [defendant's] asserted non-discriminatory reason was not the actual reason and that [defendant] intentionally discriminated against [plaintiff] on the basis of" a protected status. *Id.* "In other words, the Court must determine if the plaintiff has produced enough evidence such that a reasonable jury would find that the [defendant's] non-discriminatory reasons are mere pretext for underlying unlawful discrimination." *Perry v. Donovan*, 733 F. Supp. 2d 114, 118 (D.D.C. 2010). A plaintiff may make this showing of pretext by relying on "(1) evidence establishing the plaintiff's prima facie case; (2) evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff, such as independent evidence of discriminatory statements or attitudes on the part of the employer." *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006).

Here, State has articulated clearly non-discriminatory reasons—wholly disconnected from Plaintiff's disability—for the non-renewal of her fellowship and the so-called reassignment of her portfolio. Absent sufficient evidence, which does not exist, no reasonable jury would find that State's non-discriminatory reasons are mere pretext for underlying unlawful discrimination.

**A. Plaintiff's Non-Renewal**

First, the non-renewal of Plaintiff's fellowship had nothing to do with her disability. The record shows that Plaintiff served a one-year term in State's Office of Polar Affairs in its Bureau of Oceans and Environmental Science, as provided in her fellowship agreement, and that she rejected the terms offered to her for a second-year renewal by insisting upon a transfer from her Polar Affairs Office to a different office.

Early in her fellowship, Plaintiff expressed interest in moving to a different office, but was advised by the fellowship program manager that the only way she could do so, would be to re-enter the applicant pool and to compete with incoming fellows for placement the following year. *See* Def. Ex. 10A. Plaintiff was told that if she chose to re-interview for a different placement and was not chosen by that office, she could not then return to her original placement, and would have no placement for a second year. *Id.* With no guarantee of a second-year placement of her choice, however, Plaintiff wrote to her office's leadership that she would not seek to transfer offices, but instead would remain where she was, "with the GREAT hope" of renewing for a second year. *See* Def. Ex. 10B.

In the weeks preceding her official renewal offer with State, Plaintiff expressed her desire to move to another office for her second year to fellowship program staff. After having been told that moving to another office on a fellowship renewal was not an option, Plaintiff nevertheless conducted informal meetings with leaders in other offices, such as the Office of Marine

Conservation, toward that end. *See also* Def. Ex. 9, Deposition of Allison Schwier, June 9, 2023 ("Schwier Dep.") 72:19-74:5; *see also* Qashu Dep. 261:20-262:9.

Plaintiff received her official offer of renewal on June 3, 2016. *See* Def. Ex. 10D. As part of the renewal offer, Plaintiff would remain with the Polar Affairs Office with Dave Sohier as her mentor. *Id.* at 1. Additionally, she would have to agree to all terms contained in the letter, along with all terms in the documents referenced in the letter. *Id.* at 2. Plaintiff was instructed to accept the offer within one week of her receipt of the offer letter. *Id.*, at 2. The same day, Plaintiff met with fellowship program staff members to discuss her renewal. In that meeting, Plaintiff continued to express her desire to switch offices in her second year, despite her previous understanding that this was not an option. *See* Def. Ex. 10E, Email, "Meeting with Susie Qashu: Clarification needed"; *see also* Qashu Dep., 260:1-261:1. Plaintiff's insistence upon circumventing the process of re-entering the applicant pool in this way caused a great deal of confusion with both State and fellowship program personnel, necessitating the need to clarify what the issue was on Plaintiff's side. *See, e.g.*, Def. Ex. 10E. In short, Plaintiff had "made a commitment to stay after a tremendous amount of discussion and counseling," and State personnel "thought this matter was resolved." *Id.*

However, in Plaintiff's mind, the matter was not resolved despite what Plaintiff had been instructed about her request to change offices. Indeed, State offered Plaintiff a second year. When asked whether Plaintiff's fellowship should be renewed for a second year, Plaintiff's supervisor had previously responded that it should. *See, e.g.*, Def. 10C, Form, Host Office Intent to Renew. But as of June 9, 2016, days after her official renewal offer, Plaintiff still had not accepted the offer, and State reached out to Plaintiff by email to "better understand [her] concerns about renewing for a second year." *See* Def. Ex. 10F, Email, "FW: Chat about AAAS Fellowship renewal." Nearly a month later, Plaintiff still had not responded to State's request to meet about

her renewal concerns. *Id.* When Plaintiff finally did respond on July 7, she stated that she "would not sign off on paperwork that lists Dave Sohier as [her] mentor," and that she would explain the remainder of renewal concerns in person. *Id.* On July 12, State offered to have the "mentor" language in the renewal agreement modified, in the hopes of addressing Plaintiff's concern, and asked Plaintiff to confirm that she was "on board with this approach." *Id.*

Plaintiff did not respond to this suggestion until July 20. *Id.* Meanwhile, on July 19, the fellowship program sponsor decided to rescind Plaintiff's renewal offer because:

> [t]he deadline to submit signed renewal paperwork passed more than a month ago. Discussions with you and the host office indicate that the match of your skills and interests to the focus and needs of the office is not aligned to result in a mutually beneficial renewal year. The request to change offices and mentors is not approved.

Def. Ex. 10G. July 19, 2016 Fellowship Renewal Retraction Letter.

Ultimately, Plaintiff's fellowship ended after only one year because of Plaintiff's own actions, not Defendant's. Her renewal offer was not retracted, rather, it was in effect rejected by Plaintiff, who had boldly declared that she would not sign off on the renewal paperwork, and in fact had not done so more than a month after the offer was first made. In sum, the clear, non-discriminatory reason for the non-renewal of Plaintiff's fellowship is tied directly to Plaintiff's own decision to not accept the terms offered to her.

**B. Plaintiff's "Demotion"**

Plaintiff claims that State intentionally discriminated against her for her disability when, in October of 2016, her ocean acidification portfolio was reassigned to another, "significantly less qualified" fellow. Am. Compl. ¶¶ 99-106, 111. As with her non-renewal, the reason for this "so-called" reassignment were non-discriminatory business reasons.

As an initial matter, the record demonstrates that work was not actually reassigned, and even if it had been, reassignment in this case does not amount to an adverse action. To plead a

viable disability discrimination claim, a plaintiff must show that she suffered an adverse action because of her disability, that is, "a significant change in employment status . . . or a decision causing significant change in benefits." *Rupard v. Mayorkas*, Civ. A. No. 22-1806 (CRC), 2023 U.S. Dist. LEXIS 154603, at *11 (D.D.C. Aug. 31, 2023) (citation omitted). The record shows that Plaintiff was never solely or ultimately responsible for the ocean acidification portfolio, such that she could be "demoted" or subordinated to anyone else. What Plaintiff considers a reassignment or demotion, was merely her being joined on the same portfolio by a new colleague, because a former portfolio colleague, who had in fact been the lead on the portfolio, was leaving the agency. *See* Def. Ex. 8C, Excerpt from EEOC Affidavit of Chever Voltmer. Plaintiff was never assigned the lead on the ocean acidification portfolio, and at some point, she was joined by Elisabeth Boeck, a Boren fellow hired by Polar Affairs Office with experience in marine biology and environmental stewardship. *See* Schwier Dep. 172:17-20. Both fellows shared the portfolio, and Plaintiff continued to work on ocean acidification matters up until the very time she left State in January 2017. *Id.* at 174:11-14; *see also* Bloom Dep. 111:8-12.

Plaintiff makes no colorable allegation that being joined on her portfolio by another employee, even a significantly less qualified one, would amount to a significant change in Plaintiff's employment status or benefits. Indeed, given the ministerial and insignificant nature of the personnel change that occurred with the addition of the new employee, Plaintiff cannot point to any harm giving rise to a cognizable claim. State has articulated non-discriminatory reasons for the personnel change to the ocean acidification portfolio and therefore Summary judgment should be granted on this claim.

## III. <u>Plaintiff's Retaliation Allegations Likewise Fail.</u>

In Count III, Plaintiff alleges that State retaliated against her. First, she alleges that after she began to complain about discrimination and to ask for reasonable accommodations for her

disability, State intentionally retaliated against her by retracting the renewal of her fellowship position and denying her reasonable accommodations to attend and locate meetings. Am. Compl. at ¶ 122. Second, Plaintiff alleges that after she commenced the EEO process on or about August 1, 2016, State intentionally retaliated against her by demoting her and ultimately not renewing her fellowship.[1] *Id.* at ¶ 123.

As with discrimination, retaliation claims based on disability under the Rehabilitation Act are subject to the burden-shifting framework established in *McDonnell Douglas*. *Congress*, 2022 U.S. Dist. LEXIS 216276, at *51-53. To establish a prima facie case of retaliation, a plaintiff must show that she (1) engaged in statutorily protected activity; (2) suffered a materially adverse action by the employer; and (3) there is a but-for causal link between the two. *Id.* at *51-52 (citation omitted); *see also Brett v. Brennan*, 299 F. Supp. 3d 63, 72 (D.D.C. 2018)("The standard of causation for Rehabilitation Act claims is but-for cause, meaning that the adverse employment action would not have taken place if it were not for the plaintiffs protected status."). Courts define a "materially adverse" action in retaliation cases as one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Rupard*, 2023 U.S. Dist. LEXIS 154603, at *11 (citation omitted). After a prima facie case is established, the burden shifts to the defendant to produce a legitimate, non-retaliatory reason for its actions. *Congress*,

[1] Although Plaintiff vaguely asserts that she was subjected to "marginalization, ostracization, and false criticism in the workplace, including but not limited to demeaning behavior intended to lower coworkers' regard for her in the workplace," and "requiring her to engage in job duties that were non-essential and inconsistent with her reasonable accommodation, to induce her to publicly fail," Am. Compl. ¶ 122, only her assertions regarding retraction of her fellowship renewal offer, denial of reasonable accommodations to attend and locate meetings, and her alleged demotion give fair notice of her claim and the ground upon which it rests. To the extent Plaintiff raises any other grounds, they are not only insufficiently pled here, but they are also barred, as she failed to exhaust them administratively. *See Bowden v. United States*, 106 F.3d 433, 437 (1997) ("Complainants must timely exhaust these administrative remedies before bringing their claims to court."). *See also* Def. Ex. 37, "Notice of Acceptance of the EEO Complaint," at 1, 3-4.

2022 U.S. Dist. LEXIS 216276, at *51-52. If provided, the burden then shifts back to the plaintiff to prove that the defendant's proffered reason is pretextual. *Congress*, 2022 U.S. Dist. LEXIS 216276, at *52. When evaluating allegations of pretext, D.C. Circuit case law is clear: "this Court may not second-guess an employer's personnel decision absent demonstrably discriminatory motive." *Gross v. Akin*, 599 F. Supp. 2d 23, 31 (D.D.C. 2009) (granting summary judgment in favor of employer on employee's discrimination and retaliation claims). "Once the employer has articulated a non-discriminatory explanation for its action, . . . the issue is not the correctness or desirability of [the] reasons offered . . . [but] whether the employer honestly believes in the reasons it offers." *Id.* (quoting *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996)) (alterations in original); *Graffius v. Shinseki*, 672 F. Supp. 2d 119, 132 (D.D.C. 2009) (mere speculations as to pretext are insufficient to create a genuine issue of fact regarding an employer's articulated reasons for its decisions and avoid summary judgment.)

Even viewing the facts in the light most favorable to her, Plaintiff's case fails under *McDonnell Douglas*. Here, State has articulated, and the record shows, the legitimate, nonretaliatory reasons for each of the actions at the basis of Plaintiff's claims: (1) her fellowship renewal offer was rescinded because Plaintiff insisted upon terms she had been previously advised were not an option for her, that is, transfer to a different office without re-entering the competitive process; (2) Plaintiff did not request alternative means to attend and locate meetings, and State was under no duty to divine that Plaintiff needed those accommodations absent a specific request; and (3) Plaintiff was never demoted, and to the extent the personnel changed on the ocean acidification portfolio, it was because a former portfolio colleague was leaving the agency. On this record, Plaintiff's retaliation claim cannot survive the legitimate, non-retaliatory reason prong of the *McDonnell Douglass* analysis. And as competent a scientist as Plaintiff may be, she cannot

establish pretext simply based on her own subjective assessment of her own qualifications. *See Gross*, 599 F. Supp. 2d at 31 ("plaintiff's perception of himself, and of his work performance, is not relevant. It is the perception of the decisionmaker which is relevant").

## CONCLUSION

Plaintiff's allegations that Defendant failed to reasonably accommodate her are belied by the factual record. As she has admitted, Defendant in fact reasonably accommodated her disability from the time she was hired until the time her fellowship ended. And Plaintiff fails to plausibly allege any facts beyond bare assertions to establish a nexus between her visual impairment and any alleged discrimination or retaliation. In any event, Defendant has proffered legitimate, non-discriminatory and non-retaliatory explanations for any adverse actions Plaintiff experienced. For these reasons, summary judgment should be entered in favor of Defendant.

Dated: September 15, 2023

Respectfully submitted,

MATTHEW M. GRAVES, D.C. Bar #481052
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division

By: /s/ *L'shauntee J. Robertson*
L'SHAUNTEE J. ROBERTSON
D.C. Bar #980248
Assistant United States Attorney
601 D Street NW
Washington, DC 20530
(202) 252-1729
Lshauntee.robertson@usdoj.gov

*Attorneys for the United States of America*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SUSAN QASHU,<br>Plaintiff,<br>v.<br>ANTONY J. BLINKEN, Secretary, Department of State,<br>Defendant. | Civil No. 22-1077 (TNM) |

**DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Civil Rule 7(h), Defendant, by undersigned counsel, hereby submits the following statement of material facts to which there is no genuine dispute.

1. Susan Qashu ("Plaintiff") is a scientist who began work in 2016 at the U.S. Department of State ("Defendant" or "State"), as part of a one-year fellowship sponsored by the American Association for the Advancement of Sciences ("AAAS"). Am. Compl., ECF No. 18, ¶¶ 1, 32. As part of her fellowship, Plaintiff was placed in State's Office of Ocean and Polar Affairs ("OPA"). *Id.* at ¶ 1.

2. Throughout her time at the State Department, Plaintiff was a qualified individual with a disability as defined by the Rehabilitation Act. 29 U.S.C.S. § 705. That is, Plaintiff had a visual impairment. ECF No. 18, ¶ 2.

***Plaintiff's Fellowship***

3. Plaintiff's fellowship with State began with her selection by AAAS, as memorialized in a May 22, 2015 Fellowship Notification Letter. Def. Ex. 1A, AAAS Fellowship Notification Letter.

4. The term of Plaintiff's fellowship was for 12 months, with the possibility of renewal for an additional 12 months. *Id.* at 2 ("Fellowship Term"). Fellowship renewals were not guaranteed. Def. Ex. 1B, AAAS Fellowship 2015-2016 Terms of Agreement, at 8 ("Termination/Revocation").

5. Plaintiff's fellowship appointment became effective February 6, 2016, and was "not to exceed February 5, 2017." Def. Ex. 2, State Fellowship Confirmation Letter, Dec. 31, 2015, at 1. "Per AAAS renewal policy, AAAS fellows are eligible to extend their Fellowship for a second year, if approved by the Department of State." *Id.*

6. From her start date until approximately August 2016, Plaintiff's first-line supervisor was William Davies "Dave" Sohier. Def. Ex. 3, EEOC Deposition Transcript of Susan Qashu ("Qashu Dep."), at 256: 18-20. At Dave Sohier's departure, Plaintiff's first line supervisor was Chever Voltmer. Def. Ex. 4, Deposition Transcript of Evan Bloom ("Bloom Dep."), June 14, 2023, at 25:22-26:17. Her second line supervisor was at all times Evan Bloom, Director of OPA. *Id.*

***State's Accommodation of Plaintiff's Disability***

7. At the time of Plaintiff's fellowship, State's reasonable accommodation process was managed by its Disability and Reasonable Accommodation Division ("DRAD"). Def. Ex. 5, Deposition Transcript, Richard McCarthy ("McCarthy Dep."), May 18, 2023, at 16:2-18:19. Some of DRAD's analysts included Patricia "Patty" Pittarelli (Directory), Richard McCarthy, and Scott Duncan. *Id.* at 233:2-11.

8. Beginning in the summer of 2015, before Plaintiff's first day of work at State, DRAD analysts engaged in on-going conversation with Plaintiff about ways to accommodate her visual impairment, based initially upon a list of assistive technology that plaintiff provided. Def.

Ex. 6A, Email, "FW: from Susan Qashu: Assistive Technology Needs." Mr. McCarthy worked closely with Plaintiff to clarify her specific needs and to ensure that State provided, and when necessary, purchased the exact or similar items Plaintiff requested. *See, e.g.*, Def. Ex. 6B, Email "Re: Questions on assistive technologies at State Department."

9. Analysts with DRAD and other State personnel remained in contact with Plaintiff throughout the fall and winter of 2015 to discuss various proposed assistive technology products and to keep Plaintiff informed on the status of ordering specific products for her use during the fellowship, including an in-person meeting for Plaintiff to approve of her office space and lighting. *See, e.g*. Def. Exs 6A-6D.

10. Among the assistive equipment and software provided to Plaintiff by DRAD were:

- iPhone 6 Plus
- Large Print Slim Line Keyboard
- Optelec Clearview C OGR G2
- Ruby Handheld Magnifier
- 27" monitor
- Monitor Arm
- iPhone Keyboard
- Bose Noise Cancelling Headphones
- Zoomtext (a magnification and reading program tailored for low-vision users that enlarges and enhances everything on the computer screen, echoes typing and essential program activity, and automatically reads documents, web pages, email.
- JAWS (or "Job Access With Speech," a screen reader, that provides speech and Braille output for most popular computer applications).

*See* McCarthy Dep., at 148:18-161:16; *see also* Def. Ex. 6E, DRAD Equipment Inventory Sheet.

11. In addition to the above, DRAD provided Plaintiff with a Viseodesk CCTV to help see projected images at the front of the room during training courses at the Foreign Service Institute ("FSI"). *See* McCarthy Dep. 86:7-88:6.

12. Whenever Plaintiff experienced technical issues with any of her assistive technology, DRAD analysts worked with Plaintiff to troubleshoot them, up to and including replacing her computer entirely to ensure that her assistive technology operated efficiently. McCarthy Dep. 34:18-35:9, 42:10-44:19, 47:3-18, 245:7-253:1.

13. While DRAD managed Plaintiff's assistive technology needs, mainstream technology like Plaintiff's computer and cell phone were serviced by the Department's Bureau of Information Resource Management ("IRM"). *See* McCarthy Dep. 43:15-44:7.

14. In addition to assistive equipment and technology, Plaintiff requested and was provided on numerous occasions with the support of a reader, that is, an individual assigned to read items aloud to Plaintiff and help her complete tasks. *See e.g.,* McCarthy De. 198:6-13.

15. Plaintiff regularly praised DRAD for its work throughout her time at State. *See, generally*, Def. Ex. 7 ("I appreciate your help, and the fantastic help your office has provided. Stupendous"; "Alicia, JOY, Crystal Rich and Scott have been extremely helpful"; "Patty's office has been stupendous, even before I arrived. I have never experienced such a great accommodations office"; "…unless your office is not accommodating (WHICH your office COMPLETELY HAS, BEAUTIFULLY, Thank you."); "It has been a wonderful experience working with you all at DRAD.").

***Plaintiff's Work in OPA***

16. State's OPA office, where Plaintiff served her fellowship, advised on a wide range of scientific and environmental matters in foreign affairs. These matters are split into "portfolios", which are generally managed by one or two employees and sometimes shared with and subject to consultation from other offices. *See, e.g.,* Def. Ex. 11, Deposition Transcript of William Davies Sohier, June 23, 2023 ("Sohier Dep.") 34:21-36:19 (describing the "lionfish" portfolio).

17. While some employees and fellows served on portfolios as "points of contact," they would often work on other issues or portfolios, even if they were not designated as the point of contact. On at least one occasion, Director Bloom reminded Plaintiff that "the key issue isn't really who is 'the lead'" on a particular portfolio, and that she could still work and "make a significant contribution" on other portfolios within the office, such as the lionfish and marine invasive portfolios. As Mr. Bloom told Plaintiff, "It is often the case that offices work together on issues." *See* Def. Ex. 8A, Email, "Lionfish on held (sic)." These "overlapping responsibilities" between offices on portfolios were typical of government work in bureaucratic settings like the State Department, but that "you work things out." *See* Sohier Dep. 35:21-36:19.

18. As a fellow, Plaintiff had no "defined duties," rather she was given a portfolio of assignments based upon her interests and the needs of the office. *See* Sohier Dep. 66:1-7. Such assignments included invasive species, World Ocean Assessment, and the White House Subcommittee on Ocean Science and Technology. *See, e.g.*, Def. Ex. 8B, Email, "Initial Portfolio."

19. Upon Plaintiff's arrival, the primary point of contact for the ocean acidification portfolio was Luis Estevez-Salmeron in the Office of Marine Conservation. *See* Def. Ex. 8C, Excerpt from EEOC Affidavit of Chever Voltmer, at ¶ 56; *see also* Def. Ex. 8D, Email, "RE: CLEARANCE" (request from Salmeron for clearance on an ocean acidification issue, noting input from Plaintiff).

20. When Salmeron left State at the end of 2016, the ocean acidification portfolio reverted to OPA. In a meeting with Plaintiff and Salmeron shortly before he left, Plaintiff's then supervisor asked their views on what to do with the portfolio. Neither Salmeron nor Plaintiff recommended transferring the portfolio to Plaintiff. Thus, Plaintiff's supervisor made no specific

recommendation or selection for portfolio lead. *See* Def. Ex. 8C, Excerpt from EEOC Affidavit of Chever Voltmer, at ¶ 56.

21. In July 2015, prior to the start of Plaintiff's fellowship, Elisabeth Boeck—a *summa cum laude* graduate of Northwestern University who had minored in Environmental Policy and Culture, and had experience in marine biology and environmental stewardship—came to the attention of OPA leadership as a potential one-year Boren fellow. Boeck was eventually selected and joined OPA in the spring of 2016. *See* Def. Ex. 8D, Email, "Hiring a Boren Fellow?"

22. Once Boeck joined OPA, she, Plaintiff and others collaborated on the ocean acidification portfolio. *See, e.g,* Def. Ex. 8E, Email, "RE: Quick question about OA workshop content"; *see also* Def. Ex. 9, Deposition of Allison Schwier ("Schwier Dep.") 172:17-20. Plaintiff continued to work on ocean acidification issues until the end of her fellowship. *See* Schwier Dep. 174:11-14; *see also* Bloom Dep. 111:8-12.

**Plaintiff's Fellowship Renewal Process**

23. During the time of Plaintiff's fellowship, AAAS Fellows were typically asked about renewal six months into their fellowships. AAAS enforces its deadlines asks about renewals. *See* Schwier Dep. 23:2-14.

24. At the time of Plaintiff's fellowship, the primary staff persons at AAAS responsible for the renewal process were Kristen Barnes, Rick Kempinski, and Cynthia Robinson. *See* Schwier Dep. 51:19-53:20.

25. As early as March of 2016, about one month into her fellowship, Plaintiff began to express her dissatisfaction with her fellowship placement. She met and corresponded with Kristin Barnes, then Director of AAAS, about switching offices. Barnes explained to Plaintiff that in order to do so, she would need to go "back into the pool" and compete with other prospective fellows

for a possible placement the following year, which does not guarantee placement, even as a second year fellow. "You would be competing against the incoming class of fellows for a placement opportunity just as you did last year." Barnes told Plaintiff, "Once you make the determination that you are NOT going to renew in your office, you are committing to ending your fellowship that year." *See* Def. Ex. 10A, Email, "FW: Please meet up with me today … DECISION TO GO BACK INTO THE POO[L]"

26. After several conversations between Plaintiff, AAAS, and OPA leadership, Plaintiff ultimately decided to forego any opportunities to re-enter the fellowship pool and expressed her interest in renewing for a second year with OPA. On March 24, 2016, Plaintiff emailed her OPA supervisors to announce her decision to stay in her current placement in OPA, "with the GREAT hope of renewing with your office in 2017." Plaintiff's first-line supervisor Dave Sohier assured Plaintiff that her renewal for the following year, for his part, was "done." *See* Def. Ex. 10B, Email, FW: AAAS Renewal. The next day, after a discussion with OPA Director Bloom about keeping Plaintiff for a second year, Sohier e-signed a form expressing his approval for Plaintiff to renew her fellowship with State's OPA. *See* Def. Ex. 10C, Form Host Office Intent to Renew; *see also* Sohier Dep. 103:10-17.

27. In the weeks preceding her official renewal offer with State, Plaintiff expressed her desire to move to another office for her second year to fellowship program staff. Plaintiff conducted informal meetings with leaders in other offices, such as the Office of Marine Conservation, toward that end. *See* Schwier Dep. 72:19-74:5; *see also* Qashu Dep. 261:20-262:9.

28. Plaintiff received her official offer of renewal on June 3, 2016. *See* Def. Ex. 10D. As part of the renewal offer, Plaintiff would remain with OPA/OES with Dave Sohier as her mentor. *Id.* at 1. Additionally, Plaintiff would have to agree to all terms contained in the letter,

along with all terms in the documents referenced in the letter. *Id.* at 2. Plaintiff was instructed to accept the offer within one week of her receipt of the offer letter. *Id.*

29. The same day, Plaintiff met with fellowship program staff members to discuss her renewal. In that meeting, Plaintiff continued to express her desire to switch offices in her second year, despite her previous understanding that this was not an option. *See* Def. Ex. 10E, Email, "Meeting with Susie Qashu: Clarification needed"; *see also* Qashu Dep. 260:1-261:1.

30. As of June 9, 2016, Plaintiff still had not accepted the offer, and State reached out to Plaintiff by email to "better understand [her] concerns about renewing for a second year." See Def. Ex. 10F, Email, "FW: Chat about AAAS Fellowship renewal." Nearly a month later, Plaintiff still had not responded to State's request to meet about her renewal concerns. *Id.* When Plaintiff finally did respond on July 7, she stated that she "would not sign off on paperwork that lists Dave Sohier as [her] mentor," and that she would explain the remainder of renewal concerns in person. *Id.* On July 12, State offered to have the "mentor" language in the renewal agreement modified, in the hopes of addressing Plaintiff's concern, and asked Plaintiff to confirm that she was "on board with this approach." *Id.* Plaintiff did not respond to this suggestion until July 20. *Id.*

31. Meanwhile, on July 19, AAAS rescinded Plaintiff's renewal offer because "[t]he deadline to submit signed renewal paperwork had passed by more than a month. "Discussions with [Plaintiff] and the host office indicate that the match of [her] skills and interests to the focus and needs of the office is not aligned to result in a mutually beneficial renewal year. The request to change offices and mentors [wa]s not approved." *See* Def. Ex. 10G, July 19, 2016 Fellowship Renewal Retraction Letter.

Dated: September 15, 2023

Respectfully submitted,

MATTHEW M. GRAVES, D.C. Bar #481052
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division

By: /s/ L'Shaunteé J. Robertson
L'SHAUNTEE J. ROBERTSON
D.C. Bar #980248
Assistant United States Attorney
601 D Street NW
Washington, DC 20530
(202) 252-1729
Lshauntee.robertson@usdoj.gov

*Attorneys for the United States of America*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SUSAN QASHU,<br><br>Plaintiff,<br><br>v.<br><br>ANTONY J. BLINKEN,<br>Secretary of State,<br><br>Defendant. | Civil Action No. 22-1077 (TNM) |

**[PROPOSED] ORDER**

This matter is before the Court on Defendant's Motion for Summary Judgment. Upon consideration of the Defendant's motion, any response thereto, and the entire record herein, it is hereby

ORDERED, that the motion is GRANTED.

.

SO ORDERED this __________ day of _______________, 2023.

_________________________
TREVOR N. MCFADDEN
United States District Judge