**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **SUSAN QASHU**, | |
| Plaintiff, | |
| v. | Case No. 1:22-cv-01077 (TNM) |
| **ANTONY BLINKEN**, *et al.*, | |
| Defendants. | |

## <u>MEMORANDUM OPINION</u>

Susan Qashu is an erstwhile employee of the U.S. Department of State, where she had a fellowship in the Office of Ocean and Polar Affairs (OPA).  That fellowship was part of an arrangement between the Department and the American Association for the Advancement of the Sciences (AAAS).  AAAS sponsors recent Ph.D. graduates, like Qashu, to serve in federal agencies.

Qashu, though, suffers from a condition known as Leber's optic atrophy, which causes vision loss and therefore requires accommodations from her employer.  In this case, Qashu alleges that she informed the Department of her need for reasonable disability accommodations. But rather than supplying those accommodations, she says the Department discriminated against her, retaliated against her, and eventually forced her out.  She now sues under the Rehabilitation Act of 1973, as amended, Pub. L. No. 93-112, 87 Stat. 355.  Finding fatal flaws with Qashu's case, the Court will grant Defendants' Motion for Summary Judgment.

## I.

Susan Qashu is a 57-year-old woman with a Ph.D. in Marine and Natural Resources from the University of Arizona.  Amended Compl. (Compl.) ¶¶ 17–18, ECF No. 18; Ex. A (Qashu

Decl.) ¶¶ 1–2, ECF No. 34-3.  Around 2015, she applied for and was accepted into "a 2015–16

AAAS Science & Technology Policy Fellowship" in the State Department.  Ex. 1 (Acceptance

Ltr.) at Bates 7935,[1] ECF No. 33-1.  That fellowship was in the Bureau of Oceans and

International Environmental & Scientific Affairs, a subcomponent of OPA, with Evan Bloom as

her point of contact.  *Id*.

The fellowship was "for 12 full months, beginning on 1 September and extending

through 31 August."[2]  Acceptance Ltr. at Bates 7935.  At the end of that term, fellowships "often

may be renewed for an additional 12-month period."  *Id.*  Although Qashu alleges that the

renewal is practically pro forma, Compl. ¶¶ 36–37, the hiring materials suggest otherwise.

Acceptance Ltr. at Bates 7935.

"Renewals are not guaranteed."  Ex. 1B (Fellowship Terms of Agreement) at Bates 7932,

ECF No. 33-1.  Rather, the decision to renew the fellowship turns on the "availability of funds,"

"an offer of renewal from the host office," and "the mutual agreement of the fellow."  *Id.*; *see

also* Ex. J (Robinson Dep. Tr.) at 30:19–31:15, ECF No. 34-3.  Generally, "if an office and a

fellow are mutually feeling success," then "AAAS would be on board with continuing the

fellowship if . . . one was offered and the budget was available and [AAAS] ha[d] signed

documentation" from the participants.  Robinson Dep. Tr. at 31:11–15.

Qashu's time at the Department was vexed.  Leber's optic atrophy has rendered her

legally blind since 1985.  Qashu Decl. ¶ 4.  This condition is "uncorrectable," and its impacts are

exacerbated by "extreme stress."  *Id.*  But, although "uncorrectable," Qashu's condition *is*

---

[1] Where available, the Court cites Defendants' exhibits by reference to the Bates numbering
provided on their CM/ECF filings.

[2] Despite the terms of her offer letter, Qashu's fellowship did not actually begin until February
2016.  Ex. 2 (Appointment Ltr.) at Bates 7679, ECF No. 33-1.

manageable.  She has historically used a variety of employer-provided accommodations to function effectively in the workplace.  With such accommodations, Qashu has "always received extensive praise and accolades for [her] job performance[]."  *Id.* ¶ 3.

The main effects of Qashu's disability, as relevant to her work, are that it "makes it impossible for [her] to read text in many circumstances," particularly when it is smaller than 24-point boldface type, and that it "causes reduced perception of color," such that she "cannot read text or view images with low contrast."  Ex. B (Qashu Suppl. Decl.) ¶¶ 5–6, ECF No. 34-3.  To manage this, Qashu uses "adaptive software," Qashu Decl. ¶ 17, namely, two programs called Zoomtext and JAWS, Qashu Suppl. Decl. ¶ 11.  But these programs sometimes cause poorer-performing computers to crash.  Qashu Decl. ¶ 17.

Even when the software is performing properly, it requires Qashu to fully dedicate her attention to using it.  She thus needs a quiet workspace to function effectively.  Qashu Suppl. Decl. ¶¶ 21–23.  Sometimes, she uses noise-cancelling headphones, which also enable her to hear text-to-speech conversion software.  *Id.* ¶ 19.  Or she can work in an out-of-the-way office with reduced traffic and noise outside.  *Id.* ¶¶ 22–23.

Qashu requested these accommodations from the Department's Disability and Reasonable Accommodation Division (DRAD) before starting at OPA.  Exs. 6A–D (Qashu-DRAD Emails) at Bates 2153–54, ECF No. 33-1.  Those requests were at least partially granted—DRAD's equipment inventory shows that it issued a dozen different "Assistive Technolog[ies]" to Qashu in February 2016.  Ex. 6E (DRAD Inventory) at Bates 6038–40, ECF No. 33-1.

But the assistive technology only worked intermittently.  To start, her workstation often could not handle the demands of Zoomtext and JAWS.  Qashu Suppl. Decl. ¶¶ 8–9.  For her first

four months, her computer "regularly froze or went blank." *Id.* ¶ 8.  And when it *did* work, it was "very slow and sluggish." *Id.*  Although DRAD replaced her computer with a more powerful one, the problems persisted. *Id.* ¶ 9.  From February through November 2016, Qashu's computer functioned only sometimes. *Id.* ¶ 10.

These functionality issues contributed to workplace strife.  For one, Qashu had significant "delays in [her] work product" because of the computer issues.  Qashu Suppl. Decl. ¶ 12.  And she would regularly miss office meetings because the email notices were unreadable to her. *Id.*  Her colleagues commented on her resulting inability to complete assignments on time. *Id.*  Her supervisor, David Sohier, "berated" and "screamed at" her because of these performance issues. Qashu Decl. ¶ 7.

Qashu also sought other accommodations for her disability.  In March 2016, she began asking Sohier for "an office accommodation," *i.e.*, to be moved to another, quieter office in the building.  Qashu Suppl. Decl. ¶¶ 21–23.  But that request was not granted until October, even though there were multiple unoccupied offices in the OPA suite. *Id.* ¶ 23.

In mid-June 2016, Qashu received paperwork regarding her fellowship renewal.  Ex. 10D (Renewal Ltr.) at Bates 1838, ECF No. 33-1.  AAAS sent her a letter congratulating her and noting that State "desire[d] to renew [her] fellowship" in "recognition of [her] contributions" there. *Id.*  That letter identified her term of renewal as being from September 1, 2016, through August 31, 2017. *Id.*  And it stated that Sohier would be her mentor at OPA. *Id.*  Last, the letter informed Qashu that, to accept the renewal offer, she had to sign and return the letter, along with accompanying materials, within one week. *Id.* at Bates 1837.

The letter was dated June 3, Renewal Ltr. at Bates 1838, making Qashu's response due by June 10.  But Qashu did not accept by then.  Instead, she sought an extension because she

planned to be out of town from June 9 through June 15.  Ex. N (Extension Email) at 1–2, ECF
No. 34-3.  She asked her AAAS point of contact whether returning the form "could wait until
Thursday June 16," and he agreed.  *Id*.  But she did not return the letter by June 16 either.
Although she signed and dated it June 6, with various handwritten additions in the margins, *id*. at
Bates 1838-36, she did not send it then, Ex. 10G (Revocation Ltr.) at Bates 260, ECF No. 33-1.

On June 9, a day before the original deadline, a Department employee contacted Qashu to
"better understand her concerns about renewing for a second year."  Ex. 10F (Renewal Emails)
at Bates 7121, ECF No. 33-1.  Qashu did not respond for a month, finally replying on July 7,
weeks after her extended deadline.  *Id*. at Bates 7120.  At that point, she objected to having
Sohier listed as her "mentor" on the paperwork.  *Id*.  Although the Department agreed to
accommodate Qashu's concern, *id*. at Bates 7120–21, AAAS did not.  Instead, on July 19, it sent
Qashu a letter revoking its renewal offer.  Revocation Ltr. at Bates 260.

In its letter, AAAS noted that "[t]he deadline to submit signed renewal paperwork passed
more than a month ago."  Revocation Ltr. at Bates 260; *see also* Fellowship Terms of Agreement
at Bates 7932 ("By accepting this fellowship, the fellow agrees to respond in a timely manner to
inquiries from AAAS and the host office concerning participation in the fellowship program.").
And "discussions with [Qashu] and the host office" revealed that their interests were "not aligned
to result in a mutually beneficial year."  Revocation Ltr. at Bates 260.  Although "[r]enewals are
approved to move forward when there is mutual agreement and support from the host agency and
office, AAAS, and the fellow," AAAS felt that there was "three-way agreement that this
placement was not a good fit."  *Id*.  AAAS therefore decided not to renew Qashu's fellowship for
a second year.  *Id*.  But it left her current term untouched.  *Id*.  That left her serving out the
balance of her fellowship, to end in early February 2017.  *Id*.

In August 2016, after her fellowship was not renewed, Qashu filed a complaint with the Department's Office of Civil Rights, alleging discrimination and retaliation. Ex. Q (EEO Compl.), ECF No. 34-3. A month and a half later, one of Qashu's colleagues—whose work portfolio included matters relating to ocean acidification—left the Department. Ex. 8C (Voltmer Aff.) ¶ 56, ECF No. 31-3. Qashu, who sometimes contributed to the colleague's ocean acidification work, participated in a meeting about how to handle his portfolio moving forward. *Id*. During that meeting, a supervisor "direct[ly] question[ed]" Qashu about what should be done with the portfolio. *Id.* No one, including Qashu, proposed assigning it to her. *Id.* So the decision fell to OPA Director Evan Bloom, *id.*, who assigned the portfolio to another fellow, Liz Boeck. Ex. C (Pl. Interrogatories) at 9, ECF No. 34-3.

After Boeck was given the ocean acidification portfolio, Qashu felt that she was excluded from projects in the office. Pl. Interrogatories at 10. Her boss "effectively demoted" her and told her that she should "assist Boeck and should not speak in inter-agency meetings without authorization from Boeck." *Id.* Qashu also felt that Boeck was then given "professional opportunities" that she had been denied. *Id.*

Qashu's fellowship ended as scheduled. Ex. 7 (Goodbye Email) at Bates 5201–2, ECF No. 33-1. She filed this lawsuit five years later. *See* ECF No. 1. She alleged three violations of the Rehabilitation Act: discrimination, failure to accommodate, and retaliation. Compl. ¶¶ 107–125. The discrimination claim has five sub-parts. First, the Department's alleged denial of reasonable accommodations; second, its revocation of her renewal offer; third, her demotion; fourth, her termination; and fifth, the refusal to rehire her for a second year. *Id.* ¶ 111. The retaliation claim pointed to similar adverse actions, which Qashu claims are traceable to her EEO complaint and her requests for accommodations. *Id.* ¶¶ 122–23.

## II.

Because the parties have each moved for summary judgment, Def. Mot. for Summ. J. (MSJ), ECF No. 33; Pl. Opp'n and Cross-Mot. for Summ. J. (X-MSJ), ECF No. 35, the Court applies the familiar Rule 56(a) standard.  Fed. R. Civ. P. 56(a).  That is, "[t]he Court may grant a party summary judgment if that party can show both that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law."  *Massachusetts Coal. for Immigr. Ref. v. U.S. Dep't of Homeland Sec.*, 698 F. Supp. 3d 10, 12 (D.D.C. 2023) (cleaned up) (citing Fed. R. Civ. P. 56(a)).  "In practical terms, this means that a party is entitled to summary judgment only when no reasonable factfinder could find for the other side at trial."  *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial.  *See Brett v. Brennan,* 404 F. Supp. 3d 52, 58 (D.D.C. 2019); Fed. R. Civ. P. 56(c), (e).

## III.

Qashu brings three substantive claims.  First, she alleges that she faced discriminatory disparate treatment.  Compl. ¶¶ 107–14.  Second, she alleges that State failed to provide her reasonable accommodations for her disability.  *Id*. ¶¶ 115–19.  And third, she alleges that State retaliated against her for reporting her mistreatment.  *Id*. ¶¶ 120–25.  On each claim, the Department is entitled to judgment as a matter of law.

### A.

Start with Count 1—Qashu's disparate treatment claim.  The Rehabilitation Act adopts the standards of the Americans with Disabilities Act (ADA) and applies them to federal

employees.  29 U.S.C. § 791(f).  So it provides that federal agencies may not "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  "Disparate-treatment cases present the most easily understood type of discrimination, and occur where an employer has treated a particular person less favorably than others because of a protected trait," here, disability.  *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009) (cleaned up).  Cases interpreting the ADA are equally applicable to the Rehabilitation Act.  *Weatherspoon v. Azar,* 380 F. Supp. 3d 65, 71 (D.D.C. 2019).

Under the Rehabilitation Act, "the two essential elements of a discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's . . . disability." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008).  Proving an adverse employment action is generally simple; indeed, there is often "no dispute" about it.  *Id*.  But causation can be harder.  When a plaintiff alleges that she has been discriminated against, she may prove the causation element in either of two ways.

"First, a plaintiff may show causation through direct evidence.  That is, [s]he may submit evidence that, if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption." *Newman v. Howard Univ. Sch. of L.*, --- F. Supp. 3d ---, 2024 WL 450245, *9 (D.D.C. 2024).  "But [s]he may also show causation through indirect, or circumstantial, evidence."  *Id*. at *10.  When she does so, the Court applies "the framework set out . . . in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)."  *Id*. (cleaned up).  That triggers a burden-shifting approach.

Under *McDonnell Douglas*, a plaintiff has the initial burden to make out a "prima facie case" of discrimination. That is, she must show that "(i) the employee belongs to a protected class; (ii) the employee was still qualified for the position; (iii) despite still being qualified, the employee was fired, demoted, or otherwise adversely acted upon; and (iv) if the employee was removed, either someone else filled the position or the employer sought other applicants." *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 493 & n.1 (D.C. Cir. 2008). Once she does, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for its conduct. *McDonnell Douglas*, 411 U.S. at 802. At that point, the burden reverts to the plaintiff to show by a preponderance of the evidence that the defendant's proffered reason was pretextual. *Id*. at 804. But there is a shortcut: On a motion for summary judgment, if the defendant offers a "legitimate, nondiscriminatory reason" for its conduct, the Court "need not—*and should not*—decide whether the plaintiff actually made out a prima facie case." *Brady*, 520 F.3d at 494.

Although Qashu identifies five adverse actions underlying her discrimination claim, there are really three: the failure to accommodate, the demotion, and the non-renewal. Compl. ¶ 111. The other actions she identifies are simply different framings of the same non-renewal claim. *Id*. Consider each.

## 1.

First, Qashu's objection to the Department's accommodations is not properly presented as a discrimination claim. The Rehabilitation Act independently requires that employers provide disabled employees with reasonable workplace accommodations. *Ward v. McDonald*, 762 F.3d 24, 28 (D.C. Cir. 2014). So making insufficient accommodations actionable both on a failure-to-accommodate and on a disparate-treatment theory would make her claims impermissibly duplicative. *See Floyd v. Lee*, 968 F. Supp. 2d 308, 334 (D.D.C. 2013); *see also Sandler v.*

*Blinken*, No. 21-cv-02226 (DLF), 2022 WL 4547557, *7 (D.D.C. Sept. 29, 2022); *Gordon v. District of Columbia*, 480 F. Supp. 2d 112, 118 (D.D.C. 2007).  "Because [Qashu's] failure to accommodate theories in Count I are duplicative of Count II, the Court will dismiss them." *Sandler*, 2022 WL 4547557, at *7.[3]

**2.**

Next, the demotion.  This claim fails.  The question is whether State "discriminate[d] against" Qashu in the "terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  She claims that it did, because she feels she was demoted when Boeck took over the ocean acidification portfolio.  X-MSJ at 34–35.[4]  Not so.

Qashu raises in her affidavit that her ocean acidification "duties" were "stripped."  *E.g.*, Qashu Decl. ¶¶ 11–13; *see also* Pl. Interrogatories at 9.  The Court assumes, as it must at summary judgment, that this is true.  *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).  But even so, such a change in duties is not actionable.  Recall that the Rehabilitation Act is implicated only if State affects the "terms, conditions, and privileges" of Qashu's employment.  42 U.S.C. § 12112(a).  And the Supreme Court recently reaffirmed that rule.  *See Muldrow v. City of St. Louis*, 601 U.S. 969, 974 (2024) (holding that the language of Title VII "requires [a plaintiff] to show that [an adverse action] brought about some 'disadvantageous' change in an employment term or condition").

---

[3] In any event, the Court decides below that the Department did not fail to accommodate Qashu's disability.  *See infra*, Part III.B.  So even if the failure to accommodate could be raised as a disparate treatment claim, it would still fail as a matter of law.

[4] The Court's citations to the parties' briefs refer to the pagination generated by CM/ECF, not the original page numbers on the paper briefs.

The question, then, is whether Qashu's assignment to ocean acidification work was a "term, condition, [or] privilege" of her employment at State.  Nothing in the record supports the notion that it was.  Courts give "terms" and "conditions" a broad reading, which goes beyond mere contractual arrangements.  *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998); *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986).  But still, those words do real work and have real meaning.  They "circumscribe[] the injuries that can give rise to a suit like this one."  *Muldrow*, 601 U.S. at 974.  And under any understanding of those words, Qahsu's assignment to the ocean acidification portfolio was not a term, condition, or privilege of her employment at State.

The ocean acidification portfolio was a work assignment that Qashu especially enjoyed. *E.g.*, Qashu Decl. ¶ 20 ("I loved my ocean acidification portfolio.").  But it was only that.  No record evidence supports the notion that it was either a term or a condition of her employment at State.  She was not hired on specifically to do that work.  Acceptance Ltr. at Bates 7935; Appointment Ltr. at Bates 7679.  Nor was she assigned a role at State as a dedicated ocean acidification researcher.  *See, e.g.*, Voltmer Aff. ¶ 56 (detailing Qashu declining to volunteer for such an assignment).  Nor still does record evidence support the notion that she was informally considered to be integral to the office's ocean acidification work.  In sum, although ocean acidification was a matter that she worked on, and which she greatly enjoyed, it was *not* a term or condition of her employment at State.  And because it was not a term or condition of her employment, the removal of such duties from her would not constitute "discriminat[ion] . . . in regard to . . . terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a); *see Muldrow*, 601 U.S. at 974; *id*. at 977 (Thomas, J., dissenting) (arguing that, under *Muldrow*, terms or conditions of employment do not including "trifling harm[s]"); *Chambers v. District of*

*Columbia*, 35 F.4th 870, 876 (D.C. Cir. 2022) (recognizing that a nexus to terms and conditions of employment is an essential distinction between discrimination and retaliation claims).

But even if the removal of her ocean acidification work were a cognizable adverse action, Qashu has failed to demonstrate a genuine issue of material fact as to causation.  The record evidence does not permit a reasonable jury to conclude that this assignment was taken from her on account of her disability.  Rather, State supplied evidence suggesting that Qashu lost out on the ocean acidification work because the lead ocean acidification researcher left the office, and she did not volunteer to replace him.  Voltmer Aff. ¶ 56.  Indeed, State's evidence shows that Qashu participated in a "90-minute meeting" to discuss "what to do with the portfolio" after the previous head left.  *Id*.  During that meeting, "neither the departing employee nor [Qashu] herself recommend transferring this portfolio item to [Qashu], including in response to [a] direct question."  *Id*.  Qashu does not dispute that fact, so it is conceded.  *See Grimes v. District of Columbia*, 794 F.3d 83, 92 (D.C. Cir. 2015).[5]

This concession means that Qashu's "demotion" did not stem from animus.  Rather, it resulted from her own voluntary conduct in declining to volunteer to take on the ocean acidification work.  And under that circumstance, her discrimination claim must fail.  *See Macellaro v. Goldman*, 643 F.2d 813, 816 (D.C. Cir. 1980) (explaining promotion of other employee "caused no hardship to [Plaintiff] because [Plaintiff] did not seek any of those positions"); *cf. Elmore v. U.S. Dep't of Transp.*, 421 F.3d 1339, 1343 (Fed. Cir. 2005) (holding

---

[5] Qashu, in her Statement of Material Facts, asserts that the departing employee recommended that she take on the ocean acidification portfolio.  Pl. SUMF ¶ 114.  But she cites only her interrogatory answer for that proposition.  *Id*.  And the interrogatory says nothing of the sort.  Pl. Interrogatories at 7–10.  Nor has the Court found support for that claim elsewhere in the record. So, because she has failed to "properly support [that] assertion of fact," the Court "consider[s] the fact undisputed for purposes of the motion."  Fed. R. Civ. P. 56(e)(2).

no constructive demotion claim is available where change in job duties stemmed from plaintiff's voluntary conduct).

So Qashu is left to rely on things other than the portfolio. Specifically, she relies on having been told to assist Boeck, not to speak in meetings, and being denied professional opportunities. Pl. Interrogatories at 3–7. These, she claims, are "significantly diminished material responsibilities" that can support a demotion claim. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). But *Ellerth* does not say what Qashu claims. The line she quotes comes from a Seventh Circuit case which is itself cited in *Ellerth*. And the *Ellerth* case specifically declined to "endors[e] the specific results of" the circuit cases it cited. *Ellerth*, 524 U.S. at 761.

Rather, what *Ellerth* says is that, to be actionable, an adverse action must be "tangible." *Ellerth*, 524 U.S. at 761. For example, "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* That holding flows directly from the text of the ADA which, recall, is concerned with "*terms, conditions, and privileges* of employment," not all passing slights. 42 U.S.C. § 12112(a) (emphasis added); *see also Newman*, 2024 WL 450245, at *12; *Macellaro*, 643 F.2d at 816; *Muldrow*, 601 U.S. at 974 (holding that the "'worse' treatment must pertain to—must be 'with respect to'—employment 'terms [or] conditions.'").[6]

---

[6] That is not to say that discrimination with respect to such terms must be "significant," "[o]r serious, or substantial, or any similar adjective." *Muldrow*, 601 U.S. at 974. Rather, once discrimination with respect to a term or condition of employment is identified, the analysis is done. But *Muldrow* expressly endorsed the notion that courts must address the predicate question of what the terms and conditions of a plaintiff's employment actually are. *Id.*; *see id.* at 977 (Thomas, J., dissenting); *see also Chambers*, 35 F.4th at 875, 876 (preserving *de minimis* exception to Title VII liability).

Like her portfolio-removal claim, Qashu's claims that she was told not to speak in meetings are not cognizable.  Just as before, these injuries did not implicate any term, condition, or privilege of employment.  And although they may have been indignities to Qashu, that does not rise to the level of conduct that the statute targets.  *Cf. Flaherty v. Gas Rsch. Inst.*, 31 F.3d 451, 457 (7th Cir. 1994) (holding that a "bruised . . . ego" from reassignment that one finds "personally humiliating" is "insufficient").  Being ordered to keep silent, though no doubt demeaning, is not illegal.  And, in any event, she has again failed to adduce any evidence indicating that these actions stemmed from a discriminatory animus on the part of State.  She points to a number of unpleasant interactions between her and her boss.  But, as the Court discusses in more depth later, *infra* Part III.A.3, such interactions may be evidence of a difficult boss, but they are not evidence of discriminatory animus.  So the rest of her demotion claim must be dismissed too.

### 3.

That leaves the non-renewal.  Qashu largely proceeds through circumstantial evidence of causation.  State identifies a legitimate, nondiscriminatory reason for the non-renewal:  It says that AAAS revoked the renewal offer after Qashu did not respond for more than a month.  MSJ at 21–22.  And the record bears that out.  After receiving the letter on June 3, and getting an extension until June 16, Qashu still had not responded by July 19.  Revocation Ltr. at Bates 260.  Qashu's failure to adhere to a generally applicable rule qualifies as a legitimate and nondiscriminatory reason for her non-renewal.  *Raytheon Co. v. Hernandez*, 540 U.S. 44, 53 (2003).

Since State has proffered a legitimate reason for Qashu's non-renewal, the *McDonnell-Douglas* framework falls away and the only question is whether she has provided enough evidence for a jury to find that that reason was pretextual. *Brady*, 520 F.3d at 494.[7]  She has not.

First, no record evidence suggests that the response deadline is not enforced evenhandedly.  Uneven enforcement of a rule *could* support a discrimination claim.  *Raytheon Co.*, 540 U.S. at 55.  But the evidence here does not support that notion.  Rather, the response deadline was a generally applicable rule that applied to all AAAS fellows, disabled or not.  Nor does Qashu provide any evidence to suggest that her failure to meet the procedural rule followed from her disability.[8]

Second, Qashu did not adduce any evidence suggesting that the Department influenced AAAS's decision not to renew her fellowship.  To the contrary, the same people she alleges discriminated against her actually *encouraged* AAAS to renew her fellowship.  Ex. 10C (Sohier Renewal Req.) at Bates 14684, ECF No. 33-1.  And State rated her highly on her performance

---

[7] Qashu asserts that *Brady* does not apply here because State has not offered a legitimate, nondiscriminatory reason for her non-renewal.  Qashu Reply at 5–6, ECF No. 37.  But the Court has already explained that State *did* offer a such a reason.  She also argues that State conceded that it did not have such a reason.  *Id*. at 6.  This is perplexing.  State devoted five pages of its Motion for Summary Judgment to this issue.  MSJ at 20–22, 25–26.  And it addressed it again in its Reply.  State Reply at 5, ECF No. 36 (Section entitled "Plaintiff Raises No Genuine Dispute of Material Fact As to the Department's Legitimate, Non-Discriminatory and Non-Retaliatory Reasons for Her 'Demotion' and Non-Renewal.")  With so much ink spilled on this exact issue, the Court is hard-pressed to see how it could be considered conceded.  Last, Qashu tries to avoid *Brady* by arguing that State has made "inconsistent arguments" by simultaneously arguing that she had failed to prove an adverse action and, at the same time, arguing that any adverse action was taken for nondiscriminatory reasons.  Qashu Reply at 6–7.  But "inconsistent arguments" by defendants are nothing new, and the Federal Rules of Civil Procedure explicitly endorse them in certain contexts.  Fed. R. Civ. P. 8(d)(2), (3).  Defendants need not put all their eggs in one basket and argue only a single defense to a plaintiff's claims.

[8] Qashu does claim that her disability led her not to realize she needed to initial the bottom of each page.  Qashu Supp. Decl. ¶ 25.  But that is unrelated to needing to return the letter within a specified timeframe, which is what led to her non-renewal.

evaluation.  Ex. T (Performance Eval.), ECF No. 34-3.  The only inference a reasonable jury could draw from this is that the decision not to renew Qashu came from AAAS, not State.  But AAAS is not a defendant in this case, and the Court cannot find it liable *in absentia* and leave State to bear the costs.

Qashu resists this inference, pointing to an interrogatory response in which she claims the Department admitted to taking part in the non-renewal decision.  Pl. Stmt. of Undisputed Mat. Facts (Pl. SUMF) ¶ 97, ECF No. 34-1.  Not so.  The interrogatory she points to simply identifies individuals "involved in the decision to offer Plaintiff a second fellowship year."  Ex. L (Def. Interrogatories) at 11, ECF No. 34-3.  But it says nothing about those employees "play[ing] a role in the denial of the second year."  Pl. SUMF ¶ 97.  Indeed, that is the *opposite* of what it was about.  *Id*.  More, at least two Department employees identified in the interrogatory response supported renewal of her fellowship.  *Compare* Def. Interrogatories at 11, *with* Pl. SUMF ¶¶ 103–06; Sohier Renewal Req. at Bates 14684.

Although Qashu's circumstantial evidence fails, she purports to identify direct evidence of discrimination too.  X-MSJ at 34 (citing Pl. SUMF ¶¶ 75–77; Qashu Decl. ¶ 29).  But that evidence cannot support her discrimination claim either.  The evidence Qashu cites relates to two interactions with Sohier and one with Voltmer, who replaced him.  First, Sohier evidently "berated [Qashu] and a DRAD employee[] . . . for taking too long in arranging software so that it would print to the office computer."  Qashu Decl. ¶ 7.  But that is not itself direct evidence of discrimination because it does not address whether Sohier was motivated by Qashu's disability or, instead, as she herself identifies, her delay in setting up software.  Likewise, Qashu says that Sohier once "screamed at [her] in front of another DRAD employee" and "refused to talk to any employees" about her technical problems.  *Id*.  Again, though, these undoubtedly unpleasant

interactions reveal nothing about Sohier's underlying motives.  They are thus not direct evidence of discrimination.  *Newman*, 2024 WL 450245, at *9.  Nor, construing them as circumstantial evidence, do they overcome State's powerful arguments against finding pretext.

Last, Qashu points to a statement from Voltmer on her final day at State, in which Voltmer complained that "You struggle even with your equipment."  Qashu Decl. ¶ 29.  But this incident occurred on Qashu's "last day of employment."  *Id*.  It therefore cannot possibly be causally related to the decision not to renew her fellowship months earlier.

Although Qashu's evidence may convince a reasonable jury that Sohier is an unpleasant boss, it could not persuade a reasonable jury that he held discriminatory animus toward disabled people.  She details what appears to have been a difficult workplace.  But federal law does not ban unpleasant workplaces without some connection to a protected characteristic.  And here, Qashu has not supplied evidence of that second element.  In sum, no reasonable jury could conclude that the Department discriminated against Qashu in the non-renewal of her fellowship.  Coupled with her failure to identify other cognizable adverse actions, this means that her discrimination claims all fail.

### B.

Now the failure to accommodate claim.  This claim requires a plaintiff to show "(a) that she was disabled for purposes of the Rehabilitation Act; (b) that [Defendant] had notice of her disability; and (c) that [Defendant] denied her request for a reasonable accommodation of her disability."  *Stewart v. St. Elizabeth's Hosp.*, 589 F.3d 1305, 1307–08 (D.C. Cir. 2010).  "[A] reasonable accommodation is one employing a method of accommodation that is reasonable in the run of cases."  *Barth v. Gelb*, 2 F.3d 1180, 1187 (D.C. Cir. 1993).  It "may include . . . making existing facilities . . . readily accessible to and usable by individuals with disabilities" or

"job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9).

Qashu claims that the Department "denied [her] the reasonable accommodations she requested and refused to engage in the interactive process." Compl. ¶ 116. Because one of the elements of the failure to accommodate claim is that the defendant "denied her request for a reasonable accommodation," *Ward*, 762 F.3d at 31, Qashu must put forward evidence that she actually *made* a request for a reasonable accommodation, *see id*. At that point, the question then becomes what accommodations State provided her, and whether they were reasonable.

Start with what Qashu requested. Before she began at the Department, she sent DRAD an "Adaptive Hardware and Software List," requesting specific accommodations for her disability. Qashu-DRAD Emails at Bates 2154–55. Those requests included hardware, like a specific monitor screen, magnifying device, and laptop, *id*. at Bates 2154, and software, like Zoomtext and JAWS, *id*. DRAD then responded, looking to determine whether alternative hardware would be acceptable in response to her request. *Id*. at Bates 2640–44. In particular, DRAD noted that hardware Qashu requested did not "work reliably" with her software and would "leave[] all the ZoomText buttons and functionality not working." *Id*. at Bates 2644. According to the emails, Qashu did not respond for eleven days and, even then, did not answer the questions posed. *Id*. at Bates 2643. It was not until three weeks later that Qashu responded. *Id*. at Bates 2641. In any event, that iterative process appears to have resulted in agreement between Qashu and DRAD. *Id*. at Bates 2640; *see also id*. at Bates 3633.

The evidence shows that the Department made consistent good-faith efforts to accommodate Qashu's disability.  Indeed, it gave her most of what she requested.  *See* DRAD Inventory; *see also* Qashu Suppl. Decl. ¶ 23 (conceding State gave her the office she asked for).  And she agreed—at least at the time.  In early 2016, she described DRAD as "extremely helpful" and as providing "fantastic help."  Ex. 7 (Thank You Emails) at Bates 6174, 6848, ECF No. 31-3.  Later that year, even after being informed her fellowship would not be renewed, she said that DRAD had been "stupendous" and that she "ha[d] never experience[d] such a great accommodations office."  *Id*. at Bates 1469.  Indeed, she specifically denied that there was "some support [she] need[ed] from this office that [she was] not getting."  *Id*.  And she added that DRAD "COMPLETELY HAS, BEAUTIFULLY" accommodated her.  *Id*. at Bates 5009 (capitalization in original).  In her last week at State, she again reaffirmed that "[i]t ha[d] been a wonderful experience working with you all at DRAD."  *Id*. at Bates 5202.

Because she received the accommodations she requested, Qashu pivots to say that the provided accommodations were nonfunctional.  X-MSJ at 21–22.  The law does not require unimpeded or seamless functionality.  Instead, it requires only *reasonable* accommodations, which are those that are effective in the mine run of cases.  *See Barth*, 2 F.3d at 1187.  Although an accommodation may have some defects, that does not render it unreasonable or mean that it was not actually an accommodation.  *Contra* X-MSJ at 20–21.

The accommodations here met that standard.  Despite Qashu's arguments, nothing DRAD did amounted to "a sham proposal" that was offered in bad faith.  X-MSJ at 20–21 (quoting *Norden v. Samper*, 503 F. Supp. 2d 130, 156 (D.D.C. 2007)).  To the contrary, DRAD was exceedingly solicitous in meeting Qashu's needs, which she herself admitted.  *See* Thank You Emails at Bates 1469, 5009, 6174, 6848.  And if her equipment failed to consistently

perform well, some of those difficulties were invited by Qashu herself.  Qashu-DRAD Emails at

Bates 2644.  Recall that DRAD flagged that Qashu's hardware and software requests would

cause functionality issues, *id.*, but she insisted on going ahead with them anyway.  So any

sluggishness or lagging that her computer suffered did not undermine its performance so much

that it no longer served as a reasonable accommodation.  *Cf. Weatherspoon,* 380 F. Supp. 3d at

72-74 (denying failure to accommodate claim despite initial accommodation being insufficient

where employer engaged in good faith in interactive process).

 So what remains?  Because Qashu's requests for accommodations generally were, in fact,

granted, she is left to rely on a supposed *delay* in granting them.  X-MSJ at 24–25.  But that goes

nowhere either.  A delay in providing accommodations can amount to a constructive denial of

those accommodations, and therefore support a failure-to-accommodate claim.  *Mogenhan v.*

*Napolitano*, 613 F.3d 1162, 1168 (D.C. Cir. 2010).  But to do so, the delay must be lengthy.  The

Circuit has not drawn the line short of a three-year delay.  *See Mayers v. Labs.' Health & Safety*

*Fund of N. Am.*, 478 F.3d 364, 368 (D.C. Cir. 2007); *see also Matos v. DeVos*, 317 F. Supp. 3d

489, 499 (D.D.C. 2018) (finding two-year delay not actionable).  And this Court has held that a

six-month delay, closer to Qashu's case, "was not unreasonable considering the entirety of the

record."  *Weatherspoon,* 380 F. Supp. 3d at 72.

 Of course, the permissible length of delay may depend on the term of employment or the

type of accommodation requested.  A six-month delay *could* be unreasonable for an employee

whose job lasted six months and a day, or whose accommodation was readily available.  Here,

though, there is no such unreasonable delay.  The accommodations involved were forthcoming;

they simply took time because of the iterative process of DRAD providing equipment, Qashu

identifying issues, and DRAD needing to go back to the drawing board.  As for Qashu's request

of a quieter office, the record shows that State supplied her with substitute accommodations in the meantime—noise-cancelling headphones.  DRAD Inventory at Bates 6040; *Elzeneiny v. District of Columbia*, 125 F. Supp. 3d 18, 38 (D.D.C. 2015) (holding that provision of substitute accommodations is relevant to evaluation reasonableness of delay).  That there were interim deficiencies in some accommodations does not render them unreasonable.  *See Weatherspoon*, 380 F. Supp. 3d at 72; *see also id*. at 73 ("An employer is not liable for denying an accommodation request if it participated in good faith in an interactive process aimed to satisfy the request." (cleaned up)).

In sum, Qashu's failure-to-accommodate claim loses as a matter of law.

## C.

Last, Qashu's retaliation claim.  Here, she again falters.  "To prove retaliation, the plaintiff generally must establish that he or she suffered (i) a materially adverse action (ii) because he or she had brought or threatened to bring a discrimination claim."  *Baloch*, 550 F.3d at 1198.  These elements shake out much the same as in the discrimination claim.  To qualify as a "materially adverse" action, the consequence she suffered must have seen one that would "dissuade[] a reasonable worker from making or supporting a charge of discrimination."  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).  "Generally, such actions must result in some kind of actual change in status," and "stern" or "harsh words" do not cut it.  *Newman*, 2024 WL 450245, at *12; *see also Muldrow*, 144 S. Ct. at 976 (retaining the materially adverse action standard in retaliation context)  The causation standard remains the same as with the discrimination claim.

To sue under the Rehabilitation Act, a plaintiff must first exhaust her administrative remedies by presenting her claims to her employer's EEO board.  *Barkley v. U.S. Marshals Serv.*

*ex rel. Hylton*, 766 F.3d 25, 33 (D.C. Cir. 2014). Although Qashu raises a bevy of retaliation claims, the Department argues that the only ones she properly exhausted are her non-renewal, denial-of-accommodation, and demotion claims. MSJ at 24. Qashu does not dispute this in her response. So the Court takes it as conceded, and addresses only those exhausted claims. *See Brett,* 404 F. Supp. 3d at 59.

Recall that the record evidence in this cause unambiguously indicates that Qashu's non-renewal stemmed from her failure to respond to her renewal offer for over a month after the deadline. *Supra* Part III.A.1. More, the revocation of the renewal offer came from AAAS, and Qashu adduces no evidence suggesting that the Department contributed to it. State was not the body that declined to renew her fellowship. And Qashu does not argue that it used the AAAS as a conduit for its animus. *See Walker v. Johnson*, 798 F.3d 1085, 1095 (D.C. Cir. 2015). She thus cannot prevail on a claim against the Department. So for largely the same reasons as before, her non-renewal retaliation claim also fails.

Next, the reasonable accommodation claim. Qashu points only to the Department "denying her reasonable accommodations to attend and locate meetings." Compl. ¶ 122. But State replies that she never asked for such accommodations. MSJ at 25. And it was "under no duty to divine that [she] needed" them. *Id*. Qashu does not contest that she never asked for specific accommodations to attend meetings. The closest she comes is an oblique mention of "meeting notification . . . issues" that went unresolved by State. X-MSJ at 23. But the Department had no duty to ameliorate struggles it knew nothing about. So, because Qashu has not supplied evidence that she asked for accommodations responsive to *this* issue, her failure to accommodate claim itself must fail.

And as for the demotion claim, this claim fails too.  As the Court already addressed, the adverse actions set out in her demotion claim are not of the type covered by the Rehabilitation Act.  *Supra* Part III.A.2.  She has thus failed to identify a materially adverse action that stemmed from any protected conduct, and her claim therefore fails.  *Baloch*, 550 F.3d at 1198.

## IV.

The evidence in this case shows that Qashu struggles with a significant disability, and she has striven mightily to overcome it.  While her workplace travails may have been exacerbated by a difficult boss, she has not shown that anyone discriminated or retaliated against her because of that disability.  And the most significant setback she faced—the failure to reup her contract—was the decision of a nonparty to this suit after she inexplicably waited weeks to sign the necessary forms.  Again, there is no sign of misconduct here.

In sum, the Court will grant the State Department's Motion for Summary Judgment.  For the same reasons, it will deny Qashu's Cross-Motion.  A separate Order to that effect will issue today.


Dated: July 24, 2024                          _____
                                              TREVOR N. McFADDEN, U.S.D.J.